David G. YATER and Pattee L. Yater, Appellants–Plaintiffs,

v.

HANCOCK COUNTY PLANNING COMMISSION, Appellee–Defendant.

No. 30A01–9211–CV–365.

Court of Appeals of Indiana, First District.

May 24, 1993.

Rehearing Denied July 20, 1993.

Raymond S. Robak, Robak & Murphy, Greenfield, for appellants-plaintiffs.

David W. Stone IV, Anderson, Gregg H. Morelock, Cohen & Morelock, Greenfield, for appellee-defendant.

ROBERTSON, Judge.

David G. Yater and Pattee L. Yater (hereinafter referred to as the developers) appeal the denial of their writ of certiorari by which they sought a court order compelling the Hancock County Area Plan Commission (the Commission) to grant them primary approval of a proposed major subdivision plat.

We affirm in part.

The stipulated statement of facts establishes that the developers filed their petition for primary approval with the Commission on July 31, 1990. A technical committee heard the petition and approved it subject to certain conditions. The Commission heard the petition for the first time on August 16, 1990, but at the conclusion of the developers' presentation and at their request, the Commission again referred the matter to a technical committee which again recommended approval subject to certain conditions.

At the second hearing before the full Commission which followed, the developers, through counsel, represented that they had no inclination whatsoever to comply with the conditions of the subcommittee as recommended and accepted by the Commission and asked for a vote on the petition as it had been submitted. The petition was disapproved by a unanimous vote.

At trial, the parties stipulated that the reasons for the petition's disapproval were six of the seven conditions assigned by the Commission's technical committee before the second hearing on the petition, which were stated as follows:

1. Petitioner to obtain written evidence from the Indiana State Highway Dept. as to the right of way for SR9 at the subdiv. location and building set back line to start at this line.

2. Increase building set back off CR500N to 80' from the center line.

3. A Drainage variance to be obtained from the Drainage Board, by the petitioner, for lots 10–11.

4. Minimum lot size to be 23,000 [square] feet ... excluding any road easement or right of way.

[5]. Construct a (sic) accell/decel lane for the 11 lots on SR9 in lieu of frontage road.

[6]. If no accell/decel lane for all lots on SR9, require an internal road with on (sic) more than two (2) points of access onto SR9.

The stipulated facts and reasons for disapproval are the only record we have of the proceedings before the Commission. For organizational purposes, we have treated the reasons for disapproval under four general topics: minimum lot size, setback, drainage, and access to State Road 9 (SR9).

[1, 2] When an aggrieved party seeks relief in a trial court from an adverse administrative determination and attacks the evidentiary support for the agency's findings, he bears the burden of demonstrating that the agency's conclusions are "clearly erroneous." *Town of Beverly Shores v. Bagnall* (1992), Ind., 590 N.E.2d 1059, 1061. A reviewing court may vacate a board or commission's decision only if the evidence, when viewed as a whole, demonstrates that the conclusions reached by it are clearly erroneous. *Id.* Such a standard naturally requires great deference toward the administrative board by the reviewing court when the petition challenges findings of fact or the application of the facts to the law. *Id.* However, if the allegation is that the commission committed an error of law, no such deference is afforded and reversal by the trial court is appropriate if error of law is demonstrated. *Id.*

In reviewing the decision of a zoning board or commission, this court is bound by the same standard as the trial court. *Van Scoik v. Kosciusko County Board of Zoning Appeals* (1992), Ind.App., 598 N.E.2d 594, 595, *trans. denied.* There is a presumption that determinations of a zoning board, as an administrative agency with expertise in the area of zoning problems, are correct and should not be overturned unless they are arbitrary, capricious, or an abuse of discretion. *Id.* Thus, a reviewing court does not conduct a trial *de novo*, even though evidence may have been taken to supplement the writ of certiorari and return, I.C. 36–7–4–1009, 1016, and may not substitute its decision for that of the board. *Scoik*, 598 N.E.2d at 595. If the commission's decision is correct on any of the grounds stated for disapproval, its decision should be sustained. *Bagnall*, 590 N.E.2d 1059, 1062.

### Lot Size

Section 7–82 of the Hancock County Zoning Ordinance establishes that the mini-

mum lot area for lots proposed in an R–2 district is 23,000 square feet. However, no provision of any of Hancock County's zoning ordinances specifically states where a lot begins or ends. The developers interpret the ordinances to permit a lot to extend to the center line of the existing roadways adjoining the lots, thereby including one-half of the area of the existing right-of-way in the 23,000 required square footage. The Commission has taken the position that the developers must "exclude any road easement or right-of-way" from the minimum lot area. We find support for the Commission's interpretation in the ordinances.

Section 7–41(1) of the Subdivision Control Ordinance provides that "[s]ubdivision lots shall be adequate for the types of development and land use proposed, and shall conform to the Hancock County Zoning Ordinance requirements." A subdivision lot is "a tract ... of land of at least sufficient size to meet minimum zoning requirements for use and area and to provide such yards and other open spaces as are herein required...." Zoning Ordinance of Hancock County, § 7–118(27). The term "use" is defined as the "purpose or activity for which land ... is designed, arranged, or intended, or for which it is occupied or maintained." *Id.*, § 7–118(51).

By the terms of the Subdivision Control Ordinance, a right-of-way is a "strip of land appropriated for public use as a street, highway ... or for any drainage or public utility purpose ..." It is, by definition, not property owned by the Yaters which they may subdivide into lots to transfer for purposes of residential use, as they have indicated they intend to do with the property which is the subject of their petition. Thus, the ordinances establish that the area within the right-of-way is not part of a subdivision lot.

According to the Commission's witnesses before the trial court on the writ of certiorari, the reason for the 23,000 square foot area requirement is to provide adequate space for the installation of a septic system, i.e. to permit residential use. Right-of-ways cannot be used for this purpose. To provide sufficient *area* for residential use, a lot's dimensions must be calculated based upon area allocated by the subdivider other than the right-of-way.

The definition of "lot" is not the only provision in which the drafters of the ordinances exhibited an intent to delineate the boundary of the right-of-way as the boundary of the lot. One can infer from a comparison of the definitions of "lot width," i.e. "the horizontal distance between the side lot lines of a lot measured along a line drawn parallel to the front property line at a distance equal to the depth of the minimum required front yard," § 7–118(31), and the definition of front yard, i.e. "the space not containing any structures between a structure and thoroughfare right-of-way line," § 7–118(19), that the drafters of the Zoning Ordinance meant for the front "property" line and the thoroughfare right-of-way line to be the same line. Although "front property line" is not defined by the ordinance, we can give the term its generally accepted meaning, Zoning Ordinance, § 7–118, and conclude that the front property line refers to the boundary of the lot.

To the extent, then, that the Commission disapproved the Yaters' petition because the lots as proposed were of insufficient size to meet the requirements of the zoning ordinances, that disapproval is sustained by a reasonable interpretation of the ordinances and the evidence in support of it.

### Setback

The Commission also conditioned approval upon the requirement that the developers obtain "written evidence from the Indiana State Highway Dept. as to the right of way for SR9 at the subdivision location" and start the "building set back line"[1] at this line. The implication of this

1. Section 7–19(c) of the Subdivision Control Ordinance defines the "building line" as a "line drawn parallel to a lot line at a distance there from (sic) equal to the depth of the minimum required yard for the zone in which the lot is located as established by the Zoning Ordinance, contained in this Chapter."

condition is that the setback in the proposed plat must be at the right-of-way for SR9 as has been determined by the state highway department. The technical subcommittee also imposed the condition that the developers "[i]ncrease building setback off CR500N to 80' from the center line." The proposed plat contained a setback of 70' from the center of CR500N.

The developers relied upon § 7–82 of the zoning ordinance in proposing the location of the setback for the project. This section specifies, in chart form, the size requirements of lots and yards. The reader is referred by an asterisk above the "Minimum Depth Front Yard" column to the statement at the bottom of the page that "[t]he Minimum depth of the front yard (set-back) shall be 70 feet from the center of the road or 50 feet from the road right-of-way, whichever is greater." Since the ordinance gives the "minimum depth front yard" in chart form, the "Minimum depth of the front yard (set-back)" must refer to the location of the setback.

The Commission acknowledges, indeed, utilizes, this provision to partially explain its location of the setback. But, as to the setback along both roads, the Commission now maintains that § 7–38(1) and § 7–39(6) of the Subdivision Control Ordinance dictate the size of each right-of-way and hence, the location of the setback. At least three reasons emerge from the record for not affirming the Commission's disapproval of the setback on this basis.

First, the Commission stipulated at trial that paragraph 13(c) of its response to the writ of certiorari was not a reason for the disapproval of the developers' petition. Paragraph 13(c) stated that

[t]he plans as submitted by the Petitioner did not comply with Section 7–39 subsection 6, in that the Petitioners refused to dedicate the additional width along County Road 500 North and State Road 9 so as to insure minimum right-of-way dimensions, which under Section 7–38 subsection 1, is 130 feet for all arterial streets, such as State Road 9.

The Commission argues in its brief

[s]ection 7–39(6) ... requires that developers allocate additional property to

bring highways up to such width as a condition of approval.... The developers did not do so and the result was their lots were undersized and the set back line improperly located.

Appellee's brief, p. 19.

██ It may have been the Commission's intent to stipulate that the developers' refusal to formally dedicate, that is, open the additional width up to public use, as opposed to merely setting it aside for a future use, was not a reason for the disapproval. But there is a long-standing rule that an ordinance, which requires a local legislative body to give its approval before a certain activity may be conducted, must establish standards by which approval may be granted. *Indiana Waste Systems v. Howard County Board of Comm'rs* (1979), 180 Ind.App. 385, 389 N.E.2d 52, 60. Discretion in formulating standards should be exercised when a zoning ordinance is formulated, *Suburban Homes Corp. v. Anderson* (1970), 147 Ind.App. 419, 261 N.E.2d 376, 377, not when an ordinance is applied. Otherwise, discretion only serves to render unpredictable and possibly inequitable decisions if exercised too greatly when a plat proposal is submitted. *Id.*

Therefore, if the Hancock County ordinance is to fix a definite standard to govern future behavior, the Commission must determine the intent of the provision and apply that construction in all cases. The Commission is now urging on the basis of § 7–39(6) that the developers must at least "allocate" additional width to bring SR9 and CR500N up to the width of "dedicated" roadways. Applying this construction to the Commission's stipulation requires that it be bound by it.

Second, the Commission plainly did not apply § 7–38(1) and § 7–39(6) or § 7–82 to the lots adjoining SR9 when it disapproved the petition and its application of the provision to CR500N to require an 80' setback from the center of the road is not adequately explained by the evidence at trial or the Commission's brief. Because setback requirements interfere with the enjoyment of property rights, such requirements must be

reasonable. *Bird v. Delaware Muncie Metropolitan Plan Comm'n* (1981), Ind. App., 416 N.E.2d 482, 488.

To reiterate, the Commission required the developers to locate the setback at the *existing* right-of-way on SR9 as determined by the state highway department. It offered no evidentiary justification for placing the setback at this point and made no attempt to reconcile the requirement of § 7–82 that the setback be located at the greater of 70' from the center of the roadway or 50' from the right-of-way. The Commission argues that § 7–38(1) and § 7–39(6) warrants disapproval of the proposed 70' setback, but it does not even tell us where the setback would be if § 7–38(1) and § 7–39(6) were applied. Moreover, by advocating the use of § 7–38(1) and § 7–39(6) for SR9, the Commission is changing its reason for locating the setback where it did. It is the Commission's duty in the first instance, regardless of any requests, to furnish the developers with specific and concrete reasons for disapproval so that the developers can amend their plat to comply with the applicable ordinances. *Tippecanoe County Area Plan Comm'n v. Sheffield Developers* (1979), 181 Ind.App. 586, 394 N.E.2d 176, 185, n. 13. This duty requires the Commission to list *all* reasons at the first reasonable opportunity. *Id.*

The Commission's footwork with respect to CR500N is even more intriguing. At trial, the former director of planning testified that § 7–38(1) required a dedicated right-of-way for CR500N adjoining the subdivision of 60'. From the center of the roadway, the developers should have placed the setback at 80' (one-half of the "dedicated" right-of-way plus 50' since the total of 80' feet is greater than 70' from center of the roadway). Later, the witness acknowledged that the 60' provision did not apply to the developers because the petition was filed after November 20, 1986. He offered no other explanation for the 80' setback.

In its brief, the Commission now maintains that CR500N is a local street which is required to have a 50' right-of-way. If the methodology suggested at trial is em-

ployed, than the setback should be located from the center of the roadway at 75' (one-half of the 50' right-of-way plus 50' because the right-of-way plus 50' is greater than 70' from the center). Instead, however-er, the Commission argues that the developer should take one-half of the measurement of the existing roadway, which the evidence showed to be 33', add all of the additional width needed to bring the roadway to 50', which the Commission says is 17', for a total of 33½' and add the 50' requirement for the setback. Accordingly, the developers should have located the setback 83½' from the center of the roadway. The Commission contends it gave the developers a break of 3½' by locating the setback at 80' from the center of the road. It makes no attempt to explain why on appeal all of the additional width must be supplied by the developer from his property when at trial the developer only needed to supply half.

 The requirement that a zoning ordinance contain a concrete standard is dictated by due process considerations. *Sheffield Developers*, 394 N.E.2d at 185. A standard must be written with sufficient precision to give fair warning as to what the Commission will consider in making its decision. *Id.* The manner in which the location of the setback is to be determined is not sufficiently circumscribed; the agency itself cannot agree upon a single application. Under these circumstances, the ordinance does not give developers fair warning.

Third, merely "allocating" additional width by moving the setback further from the right-of-way does not achieve the goal expressed at trial of ensuring space for right-of-way expansion in the future. We have concluded, as the Commission has argued, that the lot begins at the boundary of the right-of-way; hence, the area between the right-of-way and the setback is part of the lot and may be used for residential purposes. Appropriating the property later for public use as a street or roadway will ultimately preclude the property owner from using that area for a seepage or

leaching field, the asserted purpose for requiring 23,000 square feet of lot area.

The Commission's determinations that the setback along SR9 should be located along the existing building line and that the setback along CR500N should be located 80′ from the centerline are not supported by a reasonable interpretation of the ordinances nor are they supported by the evidence. The developers' failure to locate the setback as required by the Commission is not a valid reason for disapproval of their petition.

The developers also argue that application of § 7–38(1) and § 7–39(6) under the facts of this case constitutes a taking of property without just compensation in violation of the due process clause. We have determined both that the Commission is precluded from asserting § 7–38(1) and § 7–39(6) as a basis for disapproval of the petition and that application of these provisions does not explain the required location of the setbacks on SR9 and CR500N. However, the Commission was justified in disapproving the petition on the ground that the lots as proposed were undersized. Where as here a case can be decided on narrower grounds, we will refrain from deciding constitutional questions. *Bagnall*, 590 N.E.2d at 1063.

### Drainage

■ The dispute over drainage concerns the existence of a nonoperational regulated drain known as the Wickard–Doerman which runs through the two northernmost proposed lots that front on SR9, # 10 and # 11. Section 7–82 of the Zoning Ordinance provides that the minimum lot size for lots proposed in an R–2 district is 23,-000 square feet. Again, the reason for this requirement, according to the Commission's witnesses at trial, is to ensure adequate space for the installation of a septic system.[2] Since the 150′ of right-of-way required for the drain cannot be used for a septic system, and the drain dissects the lots, the lots through which the drain runs

must be 23,000 square feet exclusive of the right-of-way for the drain. There seems to be no dispute that lots # 10 and # 11 in the developer's proposed subdivision are too small to meet the requirements of the ordinance regardless of how the square footage is calculated. Accordingly, the technical committee recommended that the developers obtain a variance from the drainage board or get the drainage board to vacate the drain.

The focus of the developers' argument seems to be with the Commission's decision to deny *primary* approval on the basis of the drainage matter, not with the Commission's determination that the lots would be too small without a variance or vacation of the drain. The developers maintain that the Commission's decision to deny approval is arbitrary and capricious because the Commission customarily makes the obtaining of a variance a condition of *final* approval.

The developers overlook the stipulated fact that they asked the Commission to determine whether the plat as presented to it at the primary approval stage comported with the requirements of the zoning ordinances, representing to the Commission that they had "no inclination whatsoever [of] comply[ing] with the requirements of the sub-committee." Having asked the Commission to approve or deny the plat as presented, the developers cannot now find fault with the Commission for having applied the 23,000 square foot standard at the primary approval stage. Without a variance or vacation of the drain, the lots as proposed do not meet minimum requirements for the installation of a septic system and hence, do not comply with the zoning ordinances.

*Johnson County Plan Comm'n v. RamsHead Corp.* (1984), Ind.App., 463 N.E.2d 295, is distinguishable on this basis. Unlike the plan Commission in *RamsHead*, which prematurely denied the petition before drainage plans could be approved by the drainage board, this Commission made

---

**2.** Section 7–48(2) of the subdivision control ordinance provides that a "private sewage disposal system for each lot shall be designed in accordance with the minimum requirements of the County Health Dept."

its determination only after the developers had indicated their intent not to approach the drainage board for a variance or vacation of the drain. As the court stated in *Ramshead,* "our decision to reverse the Commission's disapproval is based more on the fact that it really had no authority to hold its public hearing before RamsHead had the opportunity to comply with the ordinances. We do not, and cannot, conclude that such behavior warrants a decision the Commission is estopped from requiring such compliance ..." 463 N.E.2d at 304.

To recapitulate, the reason for the disapproval was the drain's effect upon the size of the proposed lots. The developers do not dispute that lot size is within the Commission's purview under the terms of the ordinances. The existence of the drain without a variance or vacation reduces the size of lots #10 and 11 below the minimum 23,000 square feet required by the ordinances. This is a valid ground for denying approval of the petition.

### Manner of Access

As may already be apparent, the proposed subdivision consists only of a series of lots bordering the two existing thoroughfares. The developers proposed that each lot owner would gain direct access to the roadways from driveways on the properties. The Commission approved of such a proposal with respect to the lots along CR500N, a local street, but required that the developers build an acceleration/deceleration lane for the eleven lots along SR9 or provide an internal or frontage road with no more than two points of access to SR9. The developers maintain that Hancock County lacks the authority to control the access along a state highway because that authority has been preempted by state law.

The Home Rule Act, Ind.Code § 36-1-3-1, abrogated the traditional rule that local governments possess only those powers expressly authorized by statute and declared that a local government possesses "all other powers necessary or desirable in the conduct of its affairs." I.C. 36-1-3-4(b)(2);

*City of Crown Point v. Lake County* (1987), Ind., 510 N.E.2d 684, 685. The Act specifically provides, however, that a local governmental unit does not have the power to regulate conduct that is regulated by a state agency, except as expressly granted by statute. I.C. 36-1-3-8(7). The legislature has expressly delegated to the Indiana Department of Transportation (IDOT) the authority to consent to openings made in a state highway. I.C. 8-23-6-6(a); I.C. 9-21-19-1.

■ Hence, the issue before us is whether, by this grant of authority, the legislature intended to preempt the exercise of local governmental control over questions involving access to a state highway. If the state has not chosen to occupy an area to the exclusion of municipal regulation, then a city may impose additional regulations, provided the regulations are within the governmental unit's legislative authority and are not in conflict with the rights granted or reserved by the General Assembly. *Medias v. Indianapolis* (1939), 216 Ind. 155, 165, 23 N.E.2d 590; *Hobble v. Basham* (1991), Ind.App., 575 N.E.2d 693, 697; *City of Indianapolis v. Fields* (1987), Ind.App., 506 N.E.2d 1128, 1131; *City of Indianapolis v. Clint's Wrecker* (1982), Ind.App., 440 N.E.2d 737, 746; *Board of Public Safety v. State ex rel. Benkovich* (1979), 180 Ind.App. 294, 388 N.E.2d 582, 585. A review of the statutory provisions at issue indicates, as this court has held, *City of Richmond v. S.M.O., Inc.* (1975), 165 Ind.App. 641, 333 N.E.2d 797, that the legislature did not intend for the Indiana Department of Transportation to have exclusive say over the manner of access to a state highway.

Generally, the legislation contained in I.C. 8-23-6 governs state highways in municipalities. The chapter does not limit the right of a city or town to regulate traffic over a street over which a highway is routed except as expressly provided in the chapter and subject to I.C. 9-21. I.C. 8-23-6-5.

The only limitation pertinent to this case found in the chapter is that referred to above, that "[a]n opening may not be

made" in a highway, right-of-way or roadway over which a state highway is routed "without the consent of [IDOT]." I.C. 8–23–6–6(a). The power to regulate is thus restricted insofar as it is used to authorize *openings* in a highway, its right-of-way or the roadway over which the highway is routed. To that, IDOT must assent.

However, the power to restrict access has not been explicitly made subject to the state's consent. By implication, then, the local governmental unit possesses that power without limitation. I.C. 36–1–3–5 (A unit may exercise any power it has to the extent that the power is not expressly granted to another entity). *See also, State v. Roberts* (1948), 226 Ind. 106, 76 N.E.2d 832 (Predecessor to I.C. 8–23–6–6(a) construed not to vest the department with power to forbid or prevent highway from being torn up or cut through by persons lawfully entitled to do so but to give department right and duty to see that all such acts are done in conformity with law on subject including regulations of department prescribing time and manner).

The authority to regulate traffic on state highways in municipalities is also "subject to the provisions of I.C. 9–21." I.C. 8–23–6–5. Indiana Code 9–21–1–2(a) expressly authorizes a local authority to adopt additional traffic regulations with respect to highways under the authority's jurisdiction, but the ordinance adopted "may not conflict with or duplicate a statute." Indiana Code 9–21–19–1 provides that *"[a] person* may not construct a private entrance ... connecting with a highway ... without a written permit from the ... department ..." "The action must be in accordance with the rules and requirements of the department." *Id.* (Emphasis supplied.) Approval of a permit "shall be subject to the permittee obtaining all necessary approvals involving land use from the ... plan commission ..." 105 IAC 7–1–13.

Indiana Code 9–21 thus imposes no greater limitation upon a local government's exercise of the power to regulate traffic upon a state highway than does the common law. The department's own regulation is an explicit recognition that it perceives *its* authority to be appropriately limited. *See Natural Resources Comm'n v. Porter County Drainage Board* (1991), Ind., 576 N.E.2d 587, 589 (Interpretation of statute by administrative agency charged with its enforcement entitled to great weight).

For these reasons, we reaffirm *City of Richmond v. S.M.O.* and conclude that it was not the legislature's intent to delegate exclusive authority over access to state highways to IDOT. Local governmental units may also regulate access to state highways over which they have jurisdiction provided the regulations do not conflict with or duplicate a statute. A conflict will be found where an ordinance seeks to prohibit that which a statute expressly permits, but no conflict will be found where an ordinance seeks to supplement the burdens imposed by the statute, provided the additional burdens are logically consistent with the statutory purpose. *City of Indianapolis v. Sablica* (1976), 264 Ind. 271, 342 N.E.2d 853, 855.

The additional burdens imposed by Hancock County in its zoning ordinances and comprehensive plan do not conflict with or duplicate a statute or regulation, are within the jurisdiction of the county, and are reasonable. Indiana Code 36–7–4–501 provides that a comprehensive plan shall be prepared by the plan commission and approved. The comprehensive plan must contain a statement of policy for the land use development of the jurisdiction, I.C. 36–7–4–502, and may include a plan for the county's thoroughfare system. I.C. 36–7–4–503(6). After the plan's approval, each governmental entity shall give consideration to the general policy and pattern of development set out in the plan in the adoption of zoning and land use ordinances. I.C. 36–7–4–504. No zoning ordinance may be adopted until a comprehensive plan has been approved for the jurisdiction. I.C. 36–7–4–601(a). The legislative body shall act for the purpose of lessening or avoiding congestion in public ways when it adopts a zoning ordinance. I.C. 36–7–4–601(c)(2). It may regulate how real property is developed, maintained and used, including stan-

dards for traffic circulation. I.C. 36–7–4–601(d)(2)(I).

The Hancock County Comprehensive Plan does regulate traffic safety. Under the plan, SR9 is part of the proposed arterial system, because of existing or anticipated traffic volume. Hancock County's arterial system is intended for a large volume of rapidly moving traffic. A multiplicity of access points creates unacceptable hazards for the safe and efficient movement of traffic. Accordingly, the comprehensive plan instructs that care be taken to protect major roads from congestion due to an excessive number of curb cuts or access points.

Section 7–39(1) furthers the policies and objectives set out in Hancock County's comprehensive plan by restricting the number of streets, driveways, or points of vehicle access onto an arterial street to one. Two such points of access may be permitted by the Commission if the points of access are definitely needed to improve the safety and traffic circulation in the area.

■■■ Dwane Myers, the individual who reviews permit applications for highway cuts for IDOT, testified that IDOT would try to limit the number of points of access to a state highway but if the proposed plat were approved and the property subdivided, IDOT would be forced either to permit access for each individual parcel or "take" property. This is so because ingress and egress is a property right which cannot be substantially or materially interfered with or taken without just compensation. *State v. Ensley* (1960), 240 Ind. 472, 487, 164 N.E.2d 342; *Huff v. Indiana State Highway Comm'n* (1958), 238 Ind. 280, 286, 149 N.E.2d 299. But, here, the developers already have access to SR9 and are attempting to obtain additional access for a proposed use of their property. In essence, the developers are proposing to create and sell land-locked parcels of land, thereby forcing the state to grant access and extinguish it later by condemnation proceedings. To permit such a procedure would augment the damages to be paid by the state. Moreover, it overlooks the right of the state under the police power to re-

quire a citizen to use his property in a manner that will not defeat reasonable regulations or render them ineffective. *See id.* Reasonable regulations do not take private property merely because they affect the uses to which such property may be put. *Spitler v. Town of Munster* (1937), 214 Ind. 75, 77, 14 N.E.2d 579.

Thus, Hancock County's policy of regulating land use because of traffic safety considerations is not only consistent with that of the state in granting access, it supplements and furthers it by reducing the cost to the state occasioned by unregulated land use development.

In summary, the Commission correctly disapproved the developers' plat because the lot size proposed does not meet the ordinance's specifications, the developers have refused to obtain a variance or vacation of the nonregulated drain or provide an acceleration/deceleration lane or frontage road to improve traffic safety. The trial court therefore correctly concluded that the Commission's determination should be affirmed.

Affirmed.

BAKER and NAJAM, JJ., concur.