INDIANA GAS COMPANY, INC., Including Richmond Gas Corp., and Terre Haute Gas Corp. Appellants–Petitioners,

v.

OFFICE OF UTILITY CONSUMER COUNSELOR and The Indiana Utility Regulatory Commission, Indiana Gas–Industrial Group, and The Panhandle Eastern Pipe Line Co., Appellees–Respondents.

No. 93A02–9505–EX–288.

Court of Appeals of Indiana.

Jan. 21, 1997.

Ronald E. Christian, Indiana Gas Company, Inc., Indianapolis, Daniel W. McGill, Barnes & Thornburg, Indianapolis, for Appellants.

Kay E. Pashos, PSI Energy, Inc., Plainfield, Duejean C. Garrett, Baker & Daniels Indianapolis, Peter L. Hatton, Schiff Hardin & Waite, Merrillville, Fred E. Schlegel, Baker & Daniels, Indianapolis, for Amici Curiae PSI, Energy Inc., Northern Indiana Public Service Co. and Indianapolis Water Co. in support of Appellant.

Anne E. Becker, Robert M. Glennon, Rita J. Baldwin, Christopher C. Earle, Timothy L. Stewart, Office of Utility Consumer Counselor, Indianapolis, for Appellees.

John F. Wickes, Jr., Todd A. Richardson, Pamela H. Sherwood, Lewis & Kappes, Indianapolis, for Amicus Curiae Central Soya Company, Inc., Hayes International, Inc., National Starch & Chemical Company, Slater Steels Corporation, And USX Corporation.

## OPINION

BARTEAU, Judge.

This is an appeal and cross-appeal from a decision of the Indiana Utility Regulatory Commission (Commission). Indiana Gas Company (Indiana Gas) appeals the Commission's denial of Indiana Gas's request to be permitted to recover the costs associated with the environmental cleanup of numerous manufactured gas plants. The Office of the Utility Consumer Counselor cross-appeals the Commission's decision to allow Indiana Gas to recover the costs of a change in accounting methods for retirement benefits other than pensions. We affirm the Commission on both issues.

### MANUFACTURED GAS PLANTS

Indiana Gas seeks to recover environmental cleanup costs it has incurred and believes it will incur in the future with respect to twenty-six manufactured gas plant sites located in Indiana and currently owned by Indiana Gas. Manufactured gas plants (MGPs) were once quite prevalent in Indiana and throughout the country. Beginning in the early 1800's, gas manufactured from coal and other fossil fuels was used by residential, municipal and industrial customers for various purposes, particularly lighting. Electric lights eventually displaced the manufactured gas lighting market, but manufactured gas was still used for other purposes, particularly heating, cooking and industrial applications. In the late 1930's, natural gas piped into Indiana replaced manufactured gas for most

purposes and many MGP's were decommissioned.

The process of manufacturing gas produced certain residual byproducts, most notably tar and benzene. Some of the byproducts, such as tar, were sold for various purposes. During decommissioning most salable materials were removed from the MGP sites, aboveground structures were left in place or dismantled, and belowground structures were typically filled with the remaining unsalable and unusable materials.

Beginning with the adoption of the federal Resource Conservation and Recovery Act ("RCRA") of 1976, and continuing with the Comprehensive Environmental Response Compensation and Liability Act ("CERCLA") of 1980 and the adoption of state environmental laws, owners and operators of MGP sites were made legally responsible for investigating and if necessary remediating MGP sites to protect the soil and groundwater from contamination by residuals of the gas manufacturing process, particularly benzene. Under CERCLA, all Potentially Responsible Parties ("PRPs") may be held jointly and severally liable for the investigation and remediation of sites at which hazardous wastes have been disposed. Liability is generally apportioned between PRPs based on certain criteria.[1] Those criteria include the ability of the parties to demonstrate that their contribution to the hazardous waste can be distinguished, the amount of hazardous waste involved, the degree of toxicity of the hazardous waste involved, the degree of involvement by the parties in the generation, transportation, treatment, storage, or disposal of the hazardous waste, the degree of care exercised by the parties with respect to the hazardous waste concerned, taking into consideration the characteristics of such hazardous waste, and the degree of cooperation by the parties with federal, state, or local officials to prevent any harm to the public health or the environment. *United States v. A & F Materials*, 578 F.Supp. at 1256.

In 1945, Indiana Gas, at the time known as Indiana Gas and Water Company, acquired nineteen former MGP sites from Public Service Company of Indiana, Inc. (now known as PSI Energy, Inc. (PSI)). Of those nineteen MGPs, all but one had ceased operation and been at least partially decommissioned at the time of Indiana Gas's acquisition. The seven other MGP sites owned by Indiana Gas were acquired after 1965 in a transaction with Terre Haute Gas Corporation and Richmond Gas Corporation and were never operated by Indiana Gas. The Commission denied Indiana Gas's request to recover the MGP costs in its rates.

Indiana Gas raises several issues with respect to the denial of its request to recover the environmental cleanup and remediation costs associated with its ownership of twenty-six sites formerly operated as manufactured gas plants. However, because we find one issue dispositive, we need address only it:

> Whether *Citizens Action Coalition v. Northern Indiana Public Service Company*, 485 N.E.2d 610 (Ind.1985), *cert. denied*, 476 U.S. 1137, 106 S.Ct. 2239, 90 L.Ed.2d 687 (1986) (*"Nipsco"*) precludes recovery by Indiana Gas of its manufactured gas plant environmental costs as a matter of law?

█ The Commission concluded that the *Nipsco* decision precluded recovery of the environmental cleanup costs associated with the manufactured gas plants currently owned by Indiana Gas. While courts must grant deference to an agency's fact finding, a court owes no deference to an agency's conclusions of law because the law is the province of the judiciary. *Yater v. Hancock County Planning Commission*, 614 N.E.2d 568, 570 (Ind. Ct.App.1993), *trans. denied*, *cert. denied*, 511 U.S. 1019, 114 S.Ct. 1401, 128 L.Ed.2d 73 (1994); *County Dep't of Pub. Welfare of Vanderburgh County v. Deaconess Hosp., Inc.*, 588 N.E.2d 1322, 1327 (Ind.Ct.App.1992), *trans. denied*; *Board of Trustees of Public Employees' Retirement Fund of Indiana v. Miller*, 519 N.E.2d 732, 733 (Ind.1988).

1. Referred to as "Gore Factors" because they were initially proposed by now Vice–President Albert Gore. *See United States v. A & F Materials Co., Inc.*, 578 F.Supp. 1249, 1256 (S.D.Ill.1984)(citing 126 Cong. Rec. at H9461 (1980)).

Thus, we address this issue without regard to the Commission's determination.

In *Nipsco,* our supreme court reversed the Commission's decision permitting Northern Indiana Public Service Commission ("NIPSCO") to amortize through retail rates the sunk costs of the Bailly N–1 nuclear power plant project. NIPSCO embarked upon the Bailly N–1 project in 1970, but due to numerous delays and opposition, the Bailly N–1 project was canceled in 1981 without ever being placed in service. Our supreme court determined that because Bailly N–1 was never operational, the costs were not recoverable.

The *Nipsco* opinion noted that utility charges are based upon service. 485 N.E.2d at 613. Indiana Code section 8–1–2–1(e) (West 1996) defines service as:

(e) "Service" is used in this chapter in its broadest and most inclusive sense and includes not only the use or accommodation afforded consumers or patrons but also any product or commodity furnished by any public or other utility and the plant, equipment, apparatus, appliances, property, and facility employed by any public or other utility in performing any service or in furnishing any product or commodity and devoted to the purposes in which such public or other utility is engaged and to the use and accommodation of the public.

Noting that this definition of service is "no model of statutory draftsmanship," Justice DeBruler, writing for the majority in *Nipsco,* "dissected" the statutory definition of service, and in doing so discovered three categories of service included therein:

(1) The use or accommodation afforded consumers or patrons;

(2) Any product or commodity furnished by the utility; or

(3) The plant, equipment, apparatus, appliances, property, and facility employed by the utility

(a) in performing any service, or

(b) in furnishing any product or commodity and devoted

(a) to the purposes in which such utility is engaged and

(b) to the use and accommodation of the public.

*Id.* at 613–14 (citing *Illinois–Indiana Cable Television Ass'n, Inc. v. Public Service Commission,* 427 N.E.2d 1100, 1108–09 (Ind.Ct. App.1981)). In further defining the concept of service, Justice DeBruler went on to note:

The ratemaking process has by statute and long-standing practice included the valuation of that property described in category (3) above which is "used and useful" in order to establish a rate base. The rate base consists of that utility property employed in providing the public with the service for which rates are charged and constitutes the investment upon which the return is to be earned. Any allowable operating expense must have a connection to the service rendered before it can be recovered through retail rates. This connection is established when the operating expense is incurred as a result of the process whereby existing "used and useful" property, category (3) above, is employed to produce the product or commodity, category (2) above, or accommodation, category (1) above, rate payers receive. For example, wages, salaries, fuel, maintenance plus annual charges for depreciation and operating taxes. Here, the canceled Bailly N–1 project is not an operating expense because it was not a result of this process which establishes the requisite connection to service rendered. In fact, the Bailly N–1 project could never be an operating expense. At best, it could have become "used and useful" property which then could have incurred allowable operating expenses. However, such was not the case, as the PSCI specifically found that the Bailly N–1 project was never "used and useful" property.

*Id.* at 614 (citation omitted).

■ Thus, pursuant to *Nipsco,* in order for an operating expense to be recovered through rates, the expense must have a connection to the service rendered. *Id.* The environmental cleanup costs associated with the twenty-six manufactured gas plants now owned by Indiana Gas have no connection to service rendered to Indiana Gas customers. The costs which Indiana Gas seeks to recover

were incurred as a result of the manufacturing of gas to provide service. However, with but one exception,[2] gas was not manufactured at the plants after they were acquired by Indiana Gas. Thus, there is no connection between the costs incurred by the manufacture of gas and the provision of service to Indiana Gas customers. Had Indiana Gas owned the manufactured gas plants at the time they were used to manufacture gas, then the result might be different because the cleanup expenses would be directly related to formerly "used and useful" property in the provision of service. But, since that is not the case, we are bound by our supreme court's opinion in *Nipsco* and affirm the Commission's determination that the environmental cleanup costs associated with the former manufactured gas plants now owned by Indiana Gas are not recoverable through rates.

Indiana Gas contends alternatively that because many of the manufactured gas plant sites are still used for such purposes as office space, parking and storage, this is a sufficient connection to the provision of service to meet the requirements established in *Nipsco*. We disagree. The costs were incurred as a result of the manufacture of gas, not as a result of Indiana Gas's use of the property for alternative purposes. Indiana Gas is entitled to recover only costs related to the provision of service. Taxes and like expenses relate to the present use of the property and are therefore properly included in the rate-making process. Environmental cleanup costs, on the contrary, relate to a past use of the property which occurred prior to Indiana Gas's ownership of the land. Thus, the connection is too tenuous to meet the standard established in *Nipsco*. To allow recovery of costs related only to the ownership of the land, with no connection to the provision of service, would put the ratepayers in the position of being insurers of any purchase made by Indiana Gas. Such a result is untenable.

Further, denial of recovery through rates does not leave Indiana Gas without recourse to recover the costs. Under CERCLA and other legislation, Indiana Gas may seek reimbursement for its environmental cleanup costs from previous owners and users of the land, particularly from those who used the land to manufacture gas. Because the contamination relates in large part to the manufacture of gas, the parties involved in that process should, under the Gore factors, bear the brunt of the cleanup costs.

## ACCRUAL ACCOUNTING

In the past, Indiana Gas utilized a pay-as-you-go or cash basis method of accounting for post-retirement benefits other than pensions ("other post-employment benefits" or "OPEB"). OPEBs consist mostly of retiree medical plans, life insurance, and dental and vision plans. Under the pay-as-you-go or cash basis method, Indiana Gas recovered the amount of benefits actually paid in cash to or on behalf of retirees.

Indiana Gas sought to change from a pay-as-you-go or cash basis method of accounting for its OPEBs to an accrual method of accounting. Indiana Gas's request was prompted by the issuance of Statement of Financial Accounting Standards (SFAS) 106. SFAS 106 was issued by the Financial Accounting Standards Board (FASB), the body which sets accounting standards for businesses in the United States. FASB, through SFAS 106, changed the generally accepted accounting principle for OPEBs of large companies, including utilities, from a pay-as-you-go method of accounting to an accrual method. Because of SFAS 106, Indiana Gas, at least for financial reporting purposes, must use accrual accounting for its OPEBs.

Indiana Gas sought approval of full accrual accounting recovery of OPEB costs for rate-making purposes pursuant to SFAS 106. Such recovery includes, in rates, the full recovery of the transition obligation and service cost. The transition obligation is the accrual expense for OPEBs relating to current retirees and employees which prior to the adoption of SFAS 106 had not been funded by the employer. The service cost is

---

**2.** The manufactured gas plant located in Shelbyville was used one time to manufacture gas after it was acquired by Indiana Gas.

the amount needed annually to currently pay for OPEBs.

The Commission accepted use of the accrual method of accounting for determining Indiana Gas's OPEB costs. The OUCC challenges the Commission's decision.

## STANDARD OF REVIEW

■■■ By statute, an assignment of errors that the decision of the Commission is contrary to law shall be sufficient to present both the sufficiency of the facts found to sustain the decision and the sufficiency of the evidence to sustain the finding of facts upon which it was rendered. Ind.Code § 8–1–3–1 (West Supp.1996).

Under the two-tier level of review mandated by the statute, this court first determines whether the Commission included in its decision specific findings on all factual determinations material to the ultimate conclusions. *Citizens Action Coalition of Indiana, Inc. v. Nipsco*, 555 N.E.2d 162, 165 (Ind.App.1990). Our supreme court has stated that "[the] findings of basic fact must reveal the [Commission's] analysis of the evidence and its determination therefrom regarding the various specific issues of fact which bear on the particular claim." *Perez v. United States Steel Corp.*, [426 N.E.2d 29, 33 (Ind.1981) ].

Next, this court must determine whether there is substantial evidence in the record to support the Commission's findings of fact. *Citizens Action Coalition*, [555 N.E.2d at 165]. We are not free, however, to reweigh or reanalyze the evidence presented or substitute our judgment for that of the Commission. *Id.* The substantial evidence standard authorizes this court to set aside the Commission's findings of fact only when a review of the whole record clearly indicates the agency's decision lacks a reasonably sound base of evidentiary support.

In addition to the limited review imposed by the substantial evidence test, this court must also determine whether the Commission's decision, ruling, or order is contrary to law. *Indianapolis Water Co. v. Public Service Commission of Indiana*, [484 N.E.2d 635, 637 (Ind.Ct.App.1985) ]. Specifically, the Commission must stay within its jurisdiction and conform to the statutory and legal principles which must guide its decision, ruling, or order. *Id. Gary–Hobart Water Corp. v. Indiana Utility Regulatory Commission*, 591 N.E.2d 649, 652 (Ind.Ct.App.1992).

## DISCUSSION

The OUCC challenges the Commission's approval of SFAS 106 OPEB accrual accounting on several grounds. First, the OUCC contends that the Commission abused its discretion by approving a hypothetical, unreasonable and unlawful expense. Second, the OUCC contends that the commission erred in its determination that the SFAS 106 OPEB accrual amount is fixed, known and measurable. Third, the OUCC contends that the Commission's approval of the SFAS 106 OPEB accrual amount is based upon speculation. Fourth, the OUCC contends that the Commission's approval of accrual accounting for SFAS 106 erroneously requires the retroactive recovery of the transition obligation.[3]

## I. HYPOTHETICAL, UNREASONABLE AND UNLAWFUL EXPENSE

■■■ Utility rates may not be based on a hypothetical expense. *Public Service Commission v. City of Indianapolis*, 235 Ind. 70, 131 N.E.2d 308, 317 (1956); *Office of Util. Consumer Counselor v. Indiana Cities Water Corp.*, 440 N.E.2d 14, 18 (Ind.Ct.App. 1982); *City of Muncie v. Public Service Commission*, 177 Ind.App. 155, 378 N.E.2d 896–98 (1978). The OUCC contends SFAS 106 accrual accounting for OPEBs represents a hypothetical, unreasonable and unlawful ex-

---

**3.** Indiana Gas contends that the OUCC is barred by an agreement approved in the prehearing order from raising these challenges to SFAS 106 accrual cost recovery. The agreement provided that "[t]he accounting and rate-making principles approved in the final Order in Cause No. 39348 should be employed by the Commission in this Cause for recognizing the impact, if any, of the implementation of SFAS 106 on Indiana Gas." R. Vol. 1 at 57. However, as noted by the OUCC, Indiana Gas failed to raise this issue before the Commission. Thus, it is unavailable on appeal.

pense because: (1) the number of actuarial assumptions, estimates and projections necessary for accrual accounting of OPEBs is so great that it renders the calculations purely speculative; (2) OPEBs do not vest as a matter of law and may be altered or eliminated by management at will; (3) adoption of SFAS 106 for ratemaking purposes increases revenue requirements even though there is no change in the utility's actual cost for OPEBs; and (4) adoption of SFAS 106 accrual accounting permits financial accounting practices to usurp rate-making.

### 1. Number of Actuarial Assumptions

The parties agree that nineteen or more interdependent actuarial assumptions are necessary for the accrual calculation of OPEBs. In contrast, pension benefits, which are also calculated through an accrual method, require only eleven actuarial assumptions. The OUCC argues that the great number of assumptions required for accrual accounting of OPEBs makes any calculation of future expenses mere speculation.

Both the OUCC and Indiana Gas acknowledge that all actuarial estimates are speculative to some extent, in that they anticipate future events. In fact, the Actuarial Standards Board, the Board that governs actuarial practice, noted the same:

> The committee recognized that SFAS 106 implies more precision and accuracy than exists in this area of actuarial practice. To the extent that future experience differs from that assumed, actual results will differ from expected results. The combination of the relatively long-term nature of the obligation and the potential for significant, persistent differences between actual and expected results coupled with the political and economic aspects of the benefits, increases the likelihood that significant variations can occur.

R. Vol. 17, p. 3110 (*Actuarial Compliance Guide Number 3* ).

■ However, the fact that SFAS 106 accrual accounting for OPEBs is not completely precise or guaranteed to be accurate does not make it hypothetical. All actuarial estimates involve some degree of reasoned guesswork. They are, after all, estimates.

The Commission was not required to determine that accrual accounting for OPEBs was hypothetical merely because it involves some degree of speculation.

### 2. Vesting of OPEBs

The OUCC contends that accrual accounting for OPEBs is hypothetical because the utility has the ability to decrease or eliminate these benefits at any time. The OUCC notes that OPEBs never vest, that Indiana Gas does not bargain for OPEBs, that Indiana Gas does not promise these benefits will be provided in the future and that Indiana Gas may change or eliminate the benefits at any time, as evidenced by a recent increase in the deductible charged retirees. Thus, the OUCC posits, OPEB obligations are purely hypothetical because they only arise when an employee actually retires and the company has not reduced or eliminated the OPEB benefits.

■ The OUCC is correct that Indiana Gas could eliminate OPEBs if it chose. However, the record contains evidence that in order to attract and retain quality employees, Indiana Gas must offer OPEBs comparable to other businesses vying for the same type of employees; that health insurance, pensions and OPEBs are of great concern to both employees and retirees; and that OPEBs are of great concern to the unions representing the employees. R. Vol. 13 at 2427, 2431–36. Based on this evidence, the Commission need not have determined that OPEBs are a hypothetical expense merely because they are not statutorily guaranteed.

### 3. Unreasonable & Unlawful Increased Revenues With No Change In Cost

■ The OUCC contends that SFAS 106 accrual accounting for OPEBs results in ratepayers paying three times the actual cost of current OPEBs and that forcing ratepayers to pay costs which are not expended is unreasonable and unlawful. In support, the OUCC cites *Office of Utility Consumer Counselor v. Indiana Cities Water Corp.*, 440 N.E.2d 14 (Ind.Ct.App.1982). However, *Indiana Cities* is easily distinguishable as the undisputed evidence there showed that

the taxes reflected as an expense would never be paid. In contrast, there is no evidence that Indiana Gas's OPEB costs will not be paid. Indiana Gas will have to pay the OPEB costs. The only contention is when those costs should be paid. Under accrual accounting, the future OPEB costs of current employees are considered to be part of the cost of the employee. Thus, as benefits accrue, they are reflected as a liability. In other words, accrual accounting recognizes all current and future liabilities that can be estimated. Under pay-as-you-go or cash basis accounting, those liabilities are not taken into consideration until they are actually paid out and become current expenses. Under accrual accounting, ratepayers are not paying for service they did not receive. Rather, they are paying the complete cost of that service now, both what was paid as an expense and what was recognized as a liability. Unlike the situation in *Indiana Cities*, where the liability would never be paid, the liability recognized by accrual accounting will be paid and the OUCC has established nothing unlawful or unreasonable about adoption of accrual accounting.

### 4. Financial Accounting Usurping Rate-making

The OUCC contends that the Commission failed to uphold its duty to ratepayers to ensure that Indiana Gas's charges for service were reasonable and just. *See* Ind.Code § 8-1-2-4 (The charge made by any public utility for any service rendered shall be reasonable and just, and every unjust or unreasonable charge for such service is prohibited and declared unlawful). The OUCC asserts that when the Commission authorized accrual accounting for OPEBs, it in reality ceded its power to determine fair rates in favor of the financial edicts of the accounting profession, and that doing so constituted an abuse of discretion.

The Commission had expressed, in an earlier Generic Order, its intent to approve a hybrid of pay-as-you-go and accrual accounting. Subsequently, the Emerging Issues Task Force (EITF), an advisory body created by FASB to assist in identifying emerging issues affecting financial reporting, issued a consensus opinion that, for financial reporting purposes, rate regulated companies must adopt full accrual accounting. R. Vol. 13 at 2305-10. This effectively eliminated, for accounting purposes, the Commission's intended compromise and the Commission thereafter approved full accrual accounting for Indiana Gas.

Notwithstanding FASB's and the EITF's position on the generally accepted accounting practices for rate regulated industries, the Commission was not bound by these financial accounting edicts to adopt full accrual accounting for rate standards. The Commission could have continued the pay-as-you-go method. It could have compromised somewhere in the middle or authorized full accrual accounting as it did. Indiana Gas was only required to prepare its financial statements on an accrual accounting basis. The Commission was not required to set Indiana Gas's rates on that basis.

■ Although the opinions of FASB and the EITF apply only to financial accounting, the Commission was not unreasonable in approving accrual accounting for setting Indiana Gas's rates. The Commission has the authority to determine accounting practices for rate regulated companies, and so long as they are within reason and prudence, courts may not interfere. *Boone County Rural Elec. Membership Corp. v. Public Service Commission*, 239 Ind. 525, 159 N.E.2d 121, 126 (1959). The Commission had before it extensive evidence on the issue of accrual accounting for OPEBs. It had the authoritative opinions of FASB and the EITF. Both bodies were well aware that accrual accounting for OPEBs was speculative to some degree, that OPEBs did not vest and that adoption of accrual accounting would result in a higher rate until the transition obligation was amortized. Yet, both still determined that accrual accounting should be the generally accepted accounting standard for OPEBs. In contrast, the OUCC presented only one witness who testified to the contrary.

■ It is logical and efficient for a company to operate on the same accounting basis reflected in its financial statements. And, Indiana Gas presented evidence that

not only would it be more expedient to do so, it might be financially detrimental to Indiana Gas if it reported its financial statements using accrual accounting when it was operating on a pay-as-you-go basis. Indiana Gas is entitled to a fair rate of return. *L.S. Ayres & Co. v. Indianapolis Power & Light Co.,* 169 Ind.App. 652, 351 N.E.2d 814, 821 (1976). "The return should be reasonably sufficient to assure confidence in the financial soundness of the utility and should be adequate, under efficient and economical management, to maintain and support its credit and enable it to raise the money necessary for the proper discharge of its public duties." *Id.* (quoting *Bluefield Waterworks & Improvement Co. v. Public Service Commission,* 262 U.S. 679, 692–93, 43 S.Ct. 675, 679, 67 L.Ed. 1176 (1923)). Given the potential adverse impact on Indiana Gas's financial profile from operating under one accounting method while reporting under another, the Commission was well within its discretion to approve accrual accounting and to permit Indiana Gas to recover through ratemaking the costs thereof.

The Commission may well have given substantial weight to the accounting expertise of authoritative bodies like FASB and the EITF when determining that accrual accounting for Indiana Gas's OPEBs was reasonable. However, evaluating and relying on expert testimony does not equate to relinquishment of authority.

## II. FIXED, KNOWN & MEASURABLE EXPENSE

The OUCC contends that it was error for the Commission to authorize accrual accounting because the accrual cost of OPEBs is not fixed, known and measurable. In support of its contention, the OUCC again challenges the soundness of the actuarial estimates, pointing out the vast number of factors which must be considered in making the estimates and the fact that OPEBs do not vest. The Commission had the discretion to weigh the competing claims and determine whether accrual accounting for OPEBs was definitive enough to be a fixed, known and measurable expense. This court has no authority to interfere with that decision. *Citi-*

*zens Energy Coalition, Inc. v. Indiana & Michigan Electric Co.,* 396 N.E.2d 441 (Ind. Ct.App.1979), cited by the OUCC, is distinguishable. There, this court reversed the Commission's granting of a rate increase and remanded for further proceedings because the rate increase included a large tax expense which was not in fact incurred by the utility. This court noted:

> To determine rates is beyond the jurisdiction of this court, and beyond our accounting abilities. It is certainly within our power, however, to recognize that the allowance into the rate-making process of expenses not incurred by Petitioner is patently "unreasonable," "unjust" and within the parameters of Ind.Code 8–1–2–4.

*Id.* at 448. Unlike *Citizens Energy,* there is no evidence, except the OUCC's speculation, that OPEBs will never be paid. Further, under accrual accounting, OPEBs are considered a form of deferred compensation, and the future costs associated therewith are considered present liabilities. The Commission was presented with the actuarial estimates for the costs of OPEBs and it was within the Commission's discretion to determine whether the costs were sufficiently fixed, known and measurable. We will not disturb that decision.

## III. SFAS 106 Accrual Accounting is Speculative

The OUCC merely reiterates its arguments that the OPEB accrual expense is too speculative to be valid. As noted earlier, that decision is left to the Commission. It has the authority to determine accounting methods and this court may not interfere in those decisions.

## IV. RETROACTIVE RATE–MAKING

The OUCC argues that by permitting recovery of the OPEB transition obligation, the Commission is allowing Indiana Gas to recover for a past uncollected accrual and that this amounts to prohibited retroactive rate-making. *See Indiana Telephone Corp. v. Public Service Commission of Ind.,* 131 Ind.App. 314, 171 N.E.2d 111, 124 (1960) (the Commission has the power to fix rates for the future but not to fix rates for the past). In support

of its contention, the OUCC cites to isolated testimony of Indiana Gas witness Benkert to the effect that the transition obligation does not relate to service today or tomorrow and that the transition obligation represents costs related to the past provision of service by current employees and current retirees.

█ The OUCC also alleges that the Commission failed to acknowledge the retroactive rate-making issue in its order. Indiana Gas responds that the Commission did not address this issue because the OUCC raises it for the first time on appeal. The OUCC responds that the issue was raised in its proposed order to the Commission. However, a review of the pages of the record cited by the OUCC does not support the OUCC's contention that the issue of retroactive rate-making was raised before the Commission. While there is a brief reference to the prohibition against retroactive rate-making, it occurs in a discussion of "intergenerational inequities." This brief mention of retroactivity was insufficient to raise the issue before the Commission. Thus, the Commission did not err in failing to address the issue nor did it erroneously reject the contention.

Even if the issue were not waived, it is no more persuasive than the other challenges the OUCC has raised to accrual accounting for OPEBs. As aptly noted by *amici*:

> By definition, the transition obligation *cannot* be accurately characterized as an additional expense. The transition obligation does not involve the creation of any new benefits or costs. It is simply the calculation of the amount of [OPEBs] earned, but not yet paid out, by current employees prior to a company's adoption of [SFAS 106]. In other words, it involves nothing more than putting a dollar amount on what has already been promised to current employees. If a utility were to remain on a cash basis, its customers' future rates would reflect the very same costs when the utility made the benefit payments previously earned by retirees. The transition from a cash basis to an accrual basis does not change the *amount* of [OPEB] costs which will ultimately be reflected in rates; the transition simply changes the *timing* of the recognition of these legitimate costs of

providing utility service. Current recovery of transition costs ties their recovery closer to customers who are receiving the benefit of the utility service being provided.

*Brief of Amici Curiae PSI Energy, Inc., Northern Indiana Public Service Company and Indianapolis Water Company* at 16–17.

 The approval of SFAS 106 accrual accounting for OPEBs does not amount to retroactive rate-making.

The Commission is affirmed in all respects.

SHARPNACK, C.J., and SULLIVAN, J., concur.