**CITIZENS ACTION COALITION OF INDIANA, INC., et al., Appellants–Intervenors,**

v.

**NORTHERN INDIANA PUBLIC SERVICE COMPANY, et al., Appellees–Respondent, Intervenors, and Statutory Party.**

No. 93A02–0210–EX–855.

Court of Appeals of Indiana.

Oct. 14, 2003.

Rehearing Denied Dec. 2, 2003.

Jerome E. Polk, Michael A. Mullett, Mullett, Polk & Associates, LLC, Chris Williams, Grant Smith, Citizens Action Coalition, Paul Severance, United Senior Action, Inc., Indianapolis, IN, Attorneys for Appellants Citizens Action Coalition of Indiana, Inc. and United Senior Action of Indiana, Inc.

Robert W. Wright, Rick D. Doyle, Doyle, Wright & Dean–Webster, LLP, Greenwood, IN, Shaw R. Friedman, Friedman & Associates, P.C., LaPorte, IN, Attorneys for Appellants Fourteen Individual Intervenors.

Daniel W. McGill, Barnes & Thornburg, Peter L. Hatton, Baker & Daniels, Indianapolis, IN, Attorneys for Appellees Northern Indiana Public Service Company.

John F. Wickes, Jr., Todd A. Richardson, Lewis & Kappes, Indianapolis, IN, Attorneys for Appellees NIPSCO Industrial Group.

Anne E. Becker, Randall C. Helmen, Office of Utility Consumer Counselor, Indianapolis, IN, Attorneys for Appellee Office of Utility Consumer Counselor.

Michael J. Melliere, Nancy A. White, Squire, Sanders & Dempsey, Columbus, OH, Attorneys for Appellee Indiana Harbor, Inc.

## OPINION

BAKER, Judge.

Appellants-intervenors Citizens Action Coalition of Indiana, United Senior Action of Indiana (collectively, CAC), and Fourteen Individual Intervenors (FII) appeal

an order from the Indiana Utility Regulatory Commission (IURC) accepting a settlement negotiated by appellee-defendant Northern Indiana Public Service Company (NIPSCO), appellee-intervenor NIPSCO Industrial Group—an entity comprised of NIPSCO industrial customers—and appellee-statutory party Office of the Utility Consumer Counselor (OUCC). Specifically, CAC claims that the IURC erred by (1) holding that the standard for trial court approval of class action settlements was inapplicable to the IURC's adoption of a proposed settlement; (2) resolving an IURC-initiated investigation without employing the rate-making formula contained in Indiana Code section 8–1–2–68; (3) misinterpreting the fuel adjustment charge (FAC) statutes; (4) ignoring interference in the settlement negotiations by the Governor's Office; and (5) violating the "common fund" doctrine with respect to electric utility cases.

## FACTS [1]

Since 1987, NIPSCO has been operating under an IURC order that limits the company's net operating income and rate of return on useful assets. This order had the effect of capping the rates that NIPSCO could charge its electric utility customers. The situation which resulted is best described by the OUCC:

> At that time the Fuel Adjustment Clause "earnings test" may be characterized as a spot test under which a utility was to, practically speaking, never earn its authorized [net operating income] which was the key baseline component tested—i.e.—in the quarterly [test] the utility's actual [net operating income] was compared to its authorized [net operating income]. If the actual exceeded the authorized by a cent, it was returned to customers but if actual [net operating income] was less than that authorized nothing happened. Obviously, under that statutory regime (IC 8–1–2–42) a utility must hit its authorized [net operating income] perfectly merely to earn the expected amount, which perfection never occurred. Therefore, reality dictated perpetual net underearnings.

Appellees' App. p. 9. In 1995, the General Assembly enacted Indiana Code section 8–1–2–42.3, which for the first time allowed utilities to "bank" their losses in order to offset future gains. Because NIPSCO had chronically "underearned" before section 42.3 was enacted, NIPSCO's "bank" had enormous losses which could be offset against future earnings.

On January 27, 2000, CAC filed a complaint in a separate proceeding with the IURC, alleging that NIPSCO's net operating income was greater than that allowed by the 1987 IURC order. Thus, CAC reasoned that NIPSCO was overcharging customers. On May 17, 2000, the IURC initiated this cause as an investigation on the Commission's own motion and consolidated this cause with that filed by CAC. On March 21, 2001, the IURC set aside the consolidation order.

On June 20, 2002, NIPSCO, OUCC, NIPSCO Industrials, and other commercial electric power consumers not parties to this action moved the IURC to accept a settlement crafted during negotiations and end its investigation. The settlement agreement provided as follows:

> 1. NIPSCO was to provide credits on industrial and domestic customers' bills

---

1. We heard oral argument in this case on August 20, 2003, in our courtroom at the Statehouse in Indianapolis. At that time, our Chief Judge expressed on behalf of the panel our gratitude for the excellent briefs and oral argument in what is for us a rather complicated case.

of $55 million per year until the IURC changed NIPSCO's basic rates.

2. NIPSCO's authorized annual return established in the 1987 order remained unchanged.

3. The "relevant period" for determining NIPSCO's over- and underearning would remain the same, thus leaving NIPSCO's "bank" of underearnings unaffected.

4. NIPSCO agreed to keep its corporate headquarters in Indiana.

5. NIPSCO promised to petition the IURC for the approval of an economic development rate rider, which allowed NIPSCO to charge customers in designated economic development areas less.

6. NIPSCO agreed to place in escrow $1.8 million. The IURC was authorized to award funds from this account to compensate the fees and expenses of parties who materially contributed to the settlement.

7. NIPSCO pledged to seek IURC approval of an electric service reliability incentive program whereby NIPSCO would be rewarded for providing reliable service to its customers.

The IURC found that the settlement provided considerable consumer benefits, including an immediate decrease in bills. Furthermore, the IURC found the settlement to be supported by substantial evidence and concluded that NIPSCO's rate of return established in the 1987 order was not unreasonable, unjust, or in violation of law. The IURC did recommend that the settlement include a provision whereby 40% of any earnings above NIPSCO's authorized rate of return would be shared with consumers, a recommendation that was incorporated into the final settlement. On October 9, 2002, the IURC entered an order accepting the final settlement and ending its investigation. CAC and the FII now appeal.

## DISCUSSION

### I. Need for Class Action Principles

■ CAC argues that in approving any settlement, the IURC should have used class action principles. Specifically, CAC claims that class action principles should have been applied in this case because "utility rate cases are analogous to class action suits." CAC's Br. p. 34. CAC notes that our supreme court held that a trial court's conclusion that a class action settlement is fair will survive appellate review only if " 'it has explored comprehensively all relevant factors.' " *Hefty v. All Other Members of the Certified Settlement Class,* 680 N.E.2d 843, 852 (Ind.1997) (quoting *Malchman v. Davis,* 706 F.2d 426, 434 (2d Cir.1983)). Courts were to pay special consideration to "the benefit of the settlement to class representatives and their counsel compared to the benefit of the settlement to class members" in order to assure that the class representatives and their attorneys were not "selling out" the class members. *Id.*

■ In determining whether utility rate cases are analogous to class action suits, we first note that "the [IURC]'s purpose is to insure that public utilities provide constant, reliable, and efficient service to Indiana citizens" and to "protect the public from excessive charges." *Indiana Payphone Ass'n v. Indiana Bell Tel. Co.,* 690 N.E.2d 1195, 1197 (Ind.Ct. App.1997). Thus, as we have previously held:

[S]ettlement carries a different connotation in administrative law and practice from the meaning usually ascribed to settlement of civil actions in a court. While trial courts perform a more passive role and allow the litigants to play out the contest, regulatory agencies are charged with a duty to move on their

own initiative where and when they deem appropriate. Any agreement that must be filed and approved by an agency loses its status as a strictly private contract and takes on a public interest gloss. Indeed, an agency may not accept a settlement merely because the private parties are satisfied; rather, an agency must consider whether the public interest will be served by accepting the settlement.

*Citizens Action Coalition of Indiana, Inc. v. PSI Energy, Inc.,* 664 N.E.2d 401, 406 (Ind.Ct.App.1996) (citations omitted). Consequently, the IURC is in a very different position than that of a court approving a class action settlement. The IURC's "watchdog role" lessens the need for the more rigorous inspection of a settlement in class action cases, where the public interest is not represented.

Moreover, we note that the Office of the Utility Consumer Counselor has the statutory ability to "appear on behalf of ratepayers, consumers, and the public in ... hearings before the [IURC]." Ind.Code § 8–1–1.1–4.1(a). Thus, consumers that do not retain counsel to go before the IURC essentially have two levels of protection: the IURC's "watchdog role" as an administrative agency and the OUCC's statutory role as a consumer representative in actions before the IURC. Consequently, the concerns inherent in class action litigation simply do not exist in utility rate cases. As a result, CAC's contention that class action principles must be used in approving a settlement must fail.

## II. Rate–Making

■ CAC argues that under Indiana Code section 8–1–2–68, "there is only one methodology [sic] for changing a utility's rates—the rate-of-return methodology described in *City of Evansville v. Southern Ind. Gas & Elec. Co.,* 167 Ind.App. 472, 478–82, 339 N.E.2d 562, 568–71 (1975)."

*Indiana Bell Tel. Co. v. Office of Util. Cons. Counselor,* 717 N.E.2d 613, 621–22 (Ind.Ct.App.1999). Thus, CAC contends that the IURC erred because it found the current rates were "just and reasonable" without making the findings required by *City of Evansville.*

■ In *City of Evansville,* we noted the difference between "basic facts" and "ultimate facts," findings that are required before a utility may decide what rates are "just and reasonable." Basic facts, such as the "cost of fuel" and "gross value of tangible property," must be supported by substantial evidence in the record. *City of Evansville,* 167 Ind.App. at 483, 339 N.E.2d at 571. Ultimate facts "may be described generally as factual conclusions derived from the basic facts; they are often expressed in terms of statutory criteria such as 'fair value' or 'used and useful.'" *Id.* at 167 Ind.App. at 486, 339 N.E.2d at 572–73. Ultimate facts are not reviewed for support in the record but are reviewed as questions of law for the "reasonableness of the agency's inference." *Id.* We also held that:

> [T]wo crucial facts about the rate-making methodology should be observed. First, the determination of a utility's revenue requirement is primarily an *exercise in informed regulatory judgment.* Second, if that judgment is to be exercised properly, the Commission must examine every aspect of the utility's operations and the economic environment in which the utility functions to ensure that the data it has received are representative of operating conditions that will, or should, prevail in future years.

*Id.* at 167 Ind.App. at 482, 339 N.E.2d at 570–71 (emphasis added). CAC's attack is an allegation that the IURC did not adequately "examine every aspect of the utility's operations" because the IURC's "or-

der makes none of the explicit findings of 'ultimate' or 'basic' fact." CAC's Br. p. 10.

We cannot agree with CAC's contention. The IURC's order noted that in 1987, NIPSCO's property had a value of $3.559 billion. Appellant's App. p. 569. The order also indicated in the proceedings here that an IURC staff member prepared a valuation of the property that yielded a figure of $3.22 billion. Appellant's App. p. 569. Moreover, the order acknowledged that the OUCC recommended a finding of $3.23 billion. Appellant's App. p. 569. Finally, the order pointed out that NIPSCO presented evidence that its property's fair value was $4.8 billion. Appellant's App. p. 569. The IURC determined that a valuation of NIPSCO's property from 1987—which was the figure agreed to in the settlement—was still a reasonable figure to be used in calculating NIPSCO's allowable earnings. Given the range of valuations presented, the IURC's decision is not unreasonable.

Additionally, we note that the IURC made findings with respect to NIPSCO's financial situation. The IURC found that NIPSCO had reduced its long term debt cost by $74 million per year. Appellant's App. p. 569. Thus, NIPSCO's yearly net income had increased. However, the IURC also observed that NIPSCO's allowable net operating income established in 1987—approximately $225 million—had not been adjusted for inflation. Appellant's App. p. 570. Had an inflation adjustment been made, NIPSCO's allowable net income—the "profit" NIPSCO could earn each year—would have been increased by $62 million a year. Appellant's App. p. 570.

In sum, while the IURC's order does not state every piece of evidence presented or relied upon, the findings in the IURC's order are sufficient to comprise the basic and ultimate facts discussed in *City of Evansville*. Consequently, CAC's claim must fail.

### III. Fuel Adjustment Charge Statutes

█ CAC contends that the order approving the settlement triggers the establishment of a new relevant period. Specifically, CAC contends that the order, which stated that NIPSCO's rates "need not be changed and should remain in effect" *is* an order within the meaning of Indiana Code section 8–1–2–42.3 that establishes a new relevant period. The IURC held that the last order setting "basic rates," which is referenced in Indiana Code section 8–1–2–42.3, was the 1987 order.

█ In essence, CAC challenges the IURC's statutory interpretation of Indiana Code sections 8–1–2–42(d)(3) and 8–1–2–42.3. We note that in matters of statutory interpretation, we first look to the plain language of the statute and, if unambiguous, give effect to its plain meaning. *Indianapolis Historic Partners v. State Bd. of Tax Com'rs*, 694 N.E.2d 1224, 1227 (Ind. Tax Ct.1998). Moreover, a statute is to be construed so as to not bring about an absurd result. *Ind. Mun. Power Agency v. Town of Edinburgh*, 769 N.E.2d 222, 226 (Ind.Ct.App.2002).

Per Indiana Code section 8–1–2–42, a utility is allowed to pass on the costs of fuel increases to its customers through its "fuel adjustment charge," or FAC. The utility may apply for a change in its FAC quarterly. Indiana Code section 8–1–2–42(d), which governs the requirements that must be met before a FAC may be changed, reads, in relevant part:

The commission shall conduct a formal hearing solely on the fuel cost charge requested in the petition subject to the notice requirements of IC 8–1–1–8 and shall grant the electric utility the requested fuel cost charge if it finds that . . . [t]he fuel adjustment charge applied

for will not result in the electric utility earning a return in excess of the return authorized by the commission in the last proceeding in which the basic rates and charges of the electric utility were approved. However, subject to section 42.3 of this chapter, if the fuel charge applied for will result in the electric utility earning a return in excess of the return authorized by the commission, in the last proceeding in which basic rates and charges of the electric utility were approved, the fuel charge applied for will be reduced to the point where no such excess of return will be earned.

Thus, the IURC applies an "earnings test" which determines whether the utility will earn operating income greater than that authorized by the commission's last basic rate order if the utility's FAC request is granted. In calculating the "earnings test," the IURC uses a "relevant period," defined by Indiana Code section 8–1–2–42.3 as:

> The last month of the twelve (12) month test period considered in the current application before the commission under section 42(d)(3) and 42(g)(3)(c) of this chapter and extending through the longer of the:
>
> (1) immediately preceding fifty-nine (59) months; or
>
> (2) period beginning with the first full month following the last order issued by the commission in which the utility's basic rates and charges were approved.

CAC argues that by specifically stating that "there will be no 'reset' of the 'relevant period' for FAC earnings test purposes," the settlement effectively skirts the requirements of Indiana Code section 8–1–2–42.3 and shields millions of dollars in NIPSCO earnings. CAC's Br. p. 22.

CAC argues that when the IURC stated that the 1987 rates should continue in place with the credits from the settlement, new basic rates were established which "reset" NIPSCO's earnings bank. CAC claims that but for the IURC's statement that NIPSCO's earnings bank would not be reset, NIPSCO would have had over-earnings of approximately $311 million, which earnings could have been returned to customers through price reductions. CAC's Br. p. 22.

CAC's reasoning, however, is incorrect. As part of the IURC's mission, it has the authority to investigate utility rates if it believes the rates to be unjust or unreasonable. Ind.Code § 8–1–2–58. CAC's interpretation of Indiana Code section 8–1–2–42.3 would result in the resetting of a utility's earnings bank whenever an investigation was pursued by the IURC, even if the investigation determined that no rate changes should occur. Consequently, the IURC's willingness to investigate all but the most flagrant violators would be chilled. Moreover, even if the IURC would choose to investigate utilities, settlements would be few because—under CAC's interpretation—a settlement would automatically reset the utility's earnings bank. We cannot fathom that the General Assembly intended to discourage the IURC's investigative ability.[2]

Not only would CAC's interpretation of the statute chill the IURC's investigatory power, but the results of the regulatory regime proposed by CAC are truly absurd. If, as CAC argues, basic rates are reset whenever the IURC issues any order with respect to a utility's basic rates—even if the IURC finds them reasonable—then the result will be a constant adjustment of

---

**2.** We again note that the IURC's mission is to "insure that public utilities provide constant, reliable, and efficient service to Indiana citizens" and to "protect the public from excessive charges." *Indiana Payphone Ass'n,* 690 N.E.2d at 1197.

rates. Utilities, fearful of the loss of their "banked" underearnings, will habitually file for basic rate increases, thereby creating a climate of unstable utility rates. Additionally, petitions for basic rate charges will increase the investigatory and legal costs—costs which will be eventually passed on to consumers—of the IURC, OUCC, and the utilities. Because CAC's interpretation of the statute would create appalling results and because the IURC's interpretation of the statute is reasonable, CAC's claim must fail.

### IV. Claims of Interference by Governor's Office

■ CAC claims that the final settlement should not have been accepted because "the OUCC's statutory role had been compromised by the intervention in the latter stages of negotiations by staff and others associated with the Governor's Office." Appellant's Br. p. 41. As proof, CAC offers up the "undisputed testimony," Appellant's Br. p. 43, of Chris Williams, CAC's Executive Director:

> [When] the Governor's Office concludes that, for reasons of policy or politics or both, consumer interests in a particular case must be compromised to reach a settlement that accommodates the interests of a utility and its investors and/or creditors.
>
> . . . .
>
> In my opinion, such actions on the part of the Governor's Office in response to entreaties from utilities or their investors and creditors undermine the institutional role of the [OUCC] as the legal representative and primary advocate of utility consumers.

Tr. p. 7917–18. Counsel for CAC conceded at oral argument that the charge of undue influence by the governor's office rested on this one witness's *opinion*.

We acknowledge that administrative hearings, unlike judicial proceedings, are to be conducted "in an informal manner," without the strictures of our Rules of Evidence. Ind.Code § 4–21.5–3–25. Nevertheless, an administrative agency's findings "must be based upon the kind of evidence that is *substantial and reliable*." Ind.Code `§ 4–21.5–3–27 (emphasis added). Williams's opinion that the actions on the part of the governor's office weaken the OUCC may be taken into account by the IURC in reaching a decision, but a *single opinion* voiced by an intervening party simply does not provide "substantial and reliable" evidence of the serious charge of meddling in settlement negotiations. Thus, CAC's argument is little more than an amorphous allegation best left confined to CAC's fundraising correspondence.

### V. Common Fund Doctrine

Finally, CAC argues that the settlement contravenes the common fund doctrine, which provides for attorney fees in utility cases. Specifically, CAC notes that "[t]he award of attorney's fees is allowed to be paid from a common fund on the theory that those who benefit from the creation of the fund or from the creation of any other legal benefit should share in the expenses of producing the benefit." *Northern Indiana Pub. Serv. Co. v. Citizens Action Coalition*, 548 N.E.2d 153, 161–62 (Ind. 1989).

We agree that the common fund doctrine is an important part of our common law. Certainly, an award of fees may be paid from a common fund. Such a decision is left to the IURC. *PSI Energy*, 664 N.E.2d at 405. However, from the record before us and counsel's acknowledgment at oral argument, a petition for fees has not yet been made to the IURC. Consequently, no presentation to the IURC requesting fees was ever made. As a result, no review is possible.

*CONCLUSION*

In light of the issues discussed above, we conclude that the IURC did not err in refusing to use class action principles and that the record contained sufficient facts from which the IURC could decide whether to approve the settlement. Moreover, the IURC's interpretation of the relevant Fuel Adjustment Charge statutes is reasonable. Additionally, we observe that CAC's allegations of interference by the Governor's Office are not supported by substantial evidence. Finally, we find that inasmuch as CAC and the FII have not applied to the IURC for fees and expenses and no decision as to whether an award of fees has been made by the IURC, any review of this issue is premature.

Affirmed.

BROOK, C.J., and BAILEY, J., concur.