### NORTHERN INDIANA PUBLIC SERVICE COMPANY, Appellant–Petitioner,

v.

### INDIANA OFFICE OF UTILITY CONSUMER COUNSELOR and NIPSCO Industrial Group, Appellees–Statutory party and Intervenor.

No. 93A02–0408–EX–693.

Court of Appeals of Indiana.

April 27, 2005.

Stanley C. Fickle, P. Jason Stephenson, Barnes & Thornburg LLP, Indianapolis, IN, Attorneys for Appellant.

John F. Wickes, Jr., Todd A. Richardson, Brian A. Statz, Lewis & Kappes, Indianapolis, IN, Attorneys for Appellees.

## OPINION

BAKER, Judge.

Appellant-petitioner Northern Indiana Public Service Company (NIPSCO) appeals a ruling from the Indiana Utility Regulatory Commission (Commission) claiming that an order issued by that agency disallowing NIPSCO's proposed use of a deferred accounting method for new costs it will incur to deliver electricity to retail customers was not supported by the evidence and is contrary to law. Specifically, NIPSCO claims that the Commission erred in determining that the proposed accounting method violated a settlement agreement that NIPSCO had negotiated with several of the parties to this appeal, including the Office of Utility Consumer Counselor (OUCC), and the NIPSCO Industrial Group.[1] Concluding that the Commission properly denied NIPSCO's request to use a deferred accounting method with respect to its new costs, we affirm.

### FACTS

Throughout the past decade, the Federal Energy Regulatory Commission (FERC) has undertaken many changes in the manner in which it regulates the transmission of electric power. The primary reasons for the changes have been to create competitive markets for wholesale electric power, and to create the conditions for

---

1. The NIPSCO Industrial Group is an ad hoc group of large volume consumers of electric energy receiving service from NIPSCO, comprised of Ispat Inland, Inc., Praxair, Inc., United States Steel Corporation and Cargill, Inc.

States to provide for competition at the retail level.

NIPSCO initiated this proceeding before the Commission, requesting authority to use a deferred accounting treatment for certain costs that it pays to Midwest Independent Transmission System Operator (MISO). These charges recover costs that are associated with MISO's security center, which is the building that houses the computers and personnel that are necessary to monitor the transmission grid operated by MISO. The various amounts include capital costs and expenses as well as the costs of administering MISO's open access transmission tariff. As the result of numerous regulatory changes, NIPSCO is required to pay these charges in order to obtain transmission service to provide electricity to its retail customers. The proposed accounting treatment suggested by NIPSCO would permit it to seek to recover these costs in a future proceeding establishing new basic rates and charges after the end of a certain rate moratorium period. The Commission denied this deferred accounting treatment to NIPSCO on the ground that it would constitute a de facto modification of a settlement agreement that had previously been approved by the Commission that settled NIPSCO's rate charges.

The proceeding that led to the settlement was a Commission-initiated investigation that commenced in January 2001, concurrent with the submission of a report where the Commission staff recommended an 11.46% reduction in NIPSCO's retail electric rates. This investigation superseded a complaint that had been initiated by Citizens Action Coalition of Indiana, Inc. (CAC) and individual ratepayers, alleging that NIPSCO was charging excessive rates.

The base rates in effect at that time had been established by a Commission rate order in 1987. By 1999, NIPSCO was earning approximately $23 million annually in excess of the level found reasonable in the 1987 order. Twelve days of contested evidentiary hearings were conducted during the investigation, along with a field hearing. Before the Commission issued a final order, the settlement agreement was tendered for Commission approval.

The agreement provided for NIPSCO's existing rates to remain in place, subject to certain revenue reductions providing credits to customers. The agreement also indicated that NIPSCO and the other settling parties would not bring a proceeding seeking to change NIPSCO's rates before the end of a forty-nine-month period that was set to expire on July 31, 2006. More specifically, the agreement provided that during the forty-nine month term—and any subsequent period until new base rates were established—the base rates established in 1987 would remain in place unchanged, but NIPSCO would provide credits to customers totaling $55 million annually and $225 million by the end of the forty-nine month term. Finally, this agreement stated: "Except by agreement of the Parties, NIPSCO's Basic Rates and all tariffs, terms and conditions as of the date of the Settlement Agreement shall remain unchanged during the term." Appellant's App. p. 86.

This agreement was opposed by CAC and fourteen individual intervenors who contended that greater ratepayer relief was appropriate. In response, the Commission held a two-day evidentiary hearing with regard to the settlement agreement. During that hearing, NIPSCO's witness acknowledged that "during the 49–month term, NIPSCO must also absorb many cost increases, such as increases in inflation, taxes and operation and maintenance expense such as the cost of gasoline for operating the service fleet, to mention a

few." Appellant's App. p. 116. The settlement provided for recovery of specified expenses, but did not include any provision addressing expenses directly related to MISO.

In an order that was issued in September 2002, the Commission approved the settlement agreement, with recommended modifications over the protest of CAC and the fourteen individual intervenors. However, once the modifications were finally agreed upon, the Commission denied a petition for rehearing by the fourteen individual intervenors. On appeal to this court, we affirmed the Commission's order approving the settlement. *See Citizens Action Coalition v. NIPSCO*, 796 N.E.2d 1264 (Ind.Ct.App.2003), *trans. denied.*

As noted above, NIPSCO eventually petitioned the Commission for authority to defer certain expenses associated with services received by NIPSCO as a member of MISO. This proposed deferral would permit the relevant expenses to be booked as a "regulatory asset," and they would be recoverable through rates subsequent to the end of the rate moratorium established by the settlement agreement. Appellant's App. p. 25–26. One of NIPSCO's witnesses explained that "NIPSCO committed to base rate freeze until at least August 1, 2006," and the deferred accounting would allow NIPSCO to "postpone recognition" of the specified expenses until that rate freeze was over. Appellant's App. p. 26.

The Industrial Group and the OUCC opposed the request for the deferred accounting method. At a hearing, an expert witness testified for the Industrial Group who explained that the requested relief was contrary to the rate settlement agreement. He explained that it would be inappropriate to provide special treatment for one category of expense in isolation without regard to the overall sufficiency of NIPSCO's rates, particularly where a different expense category had declined by nearly $93.3 million annually since NIPSCO's base rates were set in 1987. That witness also offered policy considerations against the requested deferral, which would charge customers in later years for costs associated with service provided in a previous period. In his opinion, the use of such a deferred method would send distorted price signals to both current and future customers.

The Commission ultimately denied the deferred accounting authority that NIPSCO had sought, finding that the rate freeze contemplated by the settlement agreement would have a direct impact on the accounting principles underlying NIPSCO's request. The Commission went on to determine that a requested deferral, such as the one here, must be predicated on a "reasonable belief" that the costs will eventually be recovered through rates. Appellant's App. p. 10. The Commission emphasized that the settlement agreement did not limit the freeze to base rates, but also required that all "tariffs, terms and conditions: remain unchanged during the settlement term." *Id.* In essence, it was determined that the effect of the proposed deferral would constitute a de facto modification of the settlement and would erode benefits to the ratepayers. NIPSCO would effectively shift expenses incurred during the freeze to the end of the term in order to permit future recovery of current costs. Also, the Commission found that NIPSCO's involvement with MISO was anticipated in the settlement, which did not provide for special treatment of any associated costs. In the end, the Commission declined to modify the settlement agreement, and construed it as requiring NIPSCO to absorb costs during the moratorium period. In part, the Commission's order provided as follows:

If we were to approve NIPSCO's request to defer the Administrative Adder Costs, our action would result in the de-facto modification of the credits to be paid to customers [under the Settlement Agreement], as approval of NIPSCO's request would result in the opportunity for the future recovery of current dollars that have been shifted to the end of the Terms.

As the Settlement Agreement contains a requirement for credits of $55 million a year to customers, it would be disingenuous and contrary to the terms of the agreement to defer $3.5 million a year in current dollars around the term of the freeze only to be waiting for customers at the end of the term.

. . .

Part of NIPSCO's argument in favor of its petition is that it would be inconsistent for the Commission to encourage public utilities to join RTO's like the Midwest ISO, yet deny those public utilities the means of recovering the costs associated with such membership. We are not unsympathetic to this concern, and if NIPSCO had not voluntarily entered into a Settlement Agreement in which it agreed to freeze its rates, tariffs, terms and conditions, and issue customer credits, there would be no reason for us to treat NIPSCO's request in the Cause any differently than the way we have treated similar requests from other public utilities. However, NIPSCO chose to enter into the Settlement Agreement and agreed to its terms, which include a rate freeze.

. . . .

[A]pproval of this request would violate the terms of the Settlement Agreement by modifying its terms in such a way that would result in the creation of a rate freeze that delays recovery, rather than prohibits the recovery of costs during the Term.

Appellant's App. p. 11.

In response to this order, NIPSCO filed a motion for reconsideration, arguing that the deferred accounting treatment was not contrary to any provision of the settlement agreement. NIPSCO pointed out that deferring these costs does not change its rates, the amount of the customer credits, or the amount of revenue NIPSCO receives from its services. The Commission did not rule on the petition for reconsideration within the period permitted for the Notice of Appeal. Hence, NIPSCO moved this court to stay the appeal temporarily in order to give the Commission more time to rule on the Petition for Reconsideration. By Order dated September 10, 2004, the Court stayed the appeal for this purpose. However, the Commission then denied the Petition for Reconsideration without analysis or comment, and NIPSCO has proceeded with the appeal.

### DISCUSSION AND DECISION

NIPSCO contends that the Commission erroneously concluded that the proposed deferred accounting method was contrary to the settlement agreement, inasmuch as that agreement addresses neither cost recovery nor accounting rules. In particular, NIPSCO argues that the requested accounting treatment would not change the billing credits or the basic rates during the term, and the Commission's order failed to indicate how the agreement would be violated if the proposed accounting method was used. Even more compelling, NIPSCO asserts that no showing was made that the intent of the agreement would be evaded by deferring the charges.

 In resolving this issue, we first note that the Commission's order is subject to appellate review to determine whether it is supported by specific findings

of fact and by sufficient evidence, as well as to determine whether the order is contrary to law. *U.S. Gypsum, Inc. v. Ind. Gas Co., Inc.,* 735 N.E.2d 790, 795 (Ind. 2000). A Commission finding can be set aside only when a review of the entire record clearly indicates that its decision lacks a reasonably sound basis of evidentiary support. *Spring Hills Developers, Inc. v. Reynolds Group, Inc.,* 792 N.E.2d 955, 958 (Ind.Ct.App.2003). In reviewing a Commission order, we do not reweigh the evidence or substitute our judgment for that of the Commission. *NIPSCO v. LaPorte,* 791 N.E.2d 271, 279 (Ind.Ct.App. 2003). Put another way, in those instances where the legislature has created a fact-finding body of experts in another branch of the government, their decision or findings should not be lightly overridden and set aside because we, as judges, might reach a contrary opinion on the same evidence. *Pub. Serv. Comm'n v. City of Indianapolis,* 235 Ind. 70, 79, 131 N.E.2d 308, 311 (1956).

■■■ We also note that a decision is contrary to law when the agency fails to stay within its jurisdiction and to abide by the statutory and legal principles that guide it. *LaPorte,* 791 N.E.2d at 278. Issues that are reviewable under this standard include questions of legality of the administrative procedure and violations of fixed legal principles as distinguished from questions of fact or expert judgment or discretion. *City of Indianapolis,* 235 Ind. at 82–83, 131 N.E.2d at 312–13. An appellate court may properly defer to the Commission's expertise both in finding the facts and in applying the law to the facts. *See Hancock County Rural Elec. Membership Corp. v. City of Greenfield,* 765 N.E.2d 618, 623 (Ind.Ct.App.2002). The Commission has the authority to determine accounting practices for rate-regulated companies and, so long as they are

within reason and prudence, courts may not interfere. *Ind. Gas Co. v. Office of Utility Consumer Counselor,* 675 N.E.2d 739, 747 (Ind.Ct.App.1997), *trans. denied.*

■ Here, we note the following language from our decision in the first appeal:

[S]ettlement carries a different connotation in administrative law and practice from the meaning usually ascribed to settlement of civil actions in a court. While trial courts perform a more passive role and allow the litigants to play out the contest, regulatory agencies are charged with a duty to move on their own initiative where and when they deem appropriate. Any agreement that must be filed and approved by an agency loses its status as a strictly private contract and takes on a public interest gloss.

*Citizens Action Coalition,* 796 N.E.2d at 1267–68 (quoting *Citizens Action Coalition of Ind. Inc. v. PSI Energy, Inc.,* 664 N.E.2d 401, 406 (Ind.Ct.App.1996)). To be sure, regulatory settlements are distinguishable from agreements that are governed purely by contract law. *Ind. Bell Tel. Co. v. Office of Utility Consumer Counselor,* 725 N.E.2d 432, 435 (Ind.Ct. App.2000).

Here, the Commission made the following finding: "This 'rate freeze' is not limited to base rates, as the Settlement Agreement expressly states that: Except by agreement of the Parties, NIPSCO's basic rates and all tariffs, terms and conditions as of the date of the Settlement Agreement shall remain unchanged during the Term." Appellant's App. p. 10.

■ In an effort to prevail upon its argument, NIPSCO attempts to draw a distinction between the "rates" addressed in the settlement agreement and the "costs" for which it sought deferred accounting, stressing that the deferral of

costs does not guarantee recovery in future rates. The Commission rejected such a distinction—and we agree with its determination—that a deferral must be based on a "reasonable belief" that the costs will eventually be recovered through rates. In essence, NIPSCO cannot show that the Commission acted without support in the record when it concluded that the terms of the settlement had a bearing on NIPSCO's request for a deferred accounting treatment. Hence, there was no error on this basis.

Alternatively, NIPSCO contends that the Commission's order was contrary to law because the Commission's authority was limited to enforcing a narrow interpretation of the settlement agreement provisions. We note, however, that NIPSCO is not claiming that it was entitled to a deferred accounting treatment as a matter of law.

■■■ In addressing this contention, we again note that the Commission indeed has broad authority to supervise settlement agreements such as the one here, and to be proactive in protecting the public interest. *See Citizens Action Coalition,* 796 N.E.2d at 1267–68. Inasmuch as settlements are under the Commission's supervision and regulation, we will accord substantial deference to a decision made by the Commission regarding a prior settlement. *U.S. Gypsum, Inc.,* 735 N.E.2d at 803–04. Also, decisions regarding accounting practices followed by public utilities are policy determinations committed to the sound discretion of the Commission. Hence, judicial interference is inappropriate so long as the Commission acts within reason and prudence. *See Indiana Gas,* 675 N.E.2d at 747.

Here, NIPSCO acknowledges that the relief it sought amounted to an exception to the ordinary accounting practices prescribed by the Commission. Thus, it fol-

lows that the generally applicable accounting standard and its ratemaking significance were fully understood by NIPSCO when it negotiated and approved the settlement. Indeed, one of the witnesses for NIPSCO expressly confirmed that this particular settlement agreement would require NIPSCO to absorb cost increases during the rate freeze. Appellant's App. p. 116. And, as noted above, the prevailing accounting standards under which NIPSCO was operating clearly fell within the "terms and conditions" that the agreement was to remain unchanged during the settlement period. Appellant's App. p. 86.

■■■ Finally, NIPSCO implies that the Commission was required to treat it in the same manner as other utilities that were allowed by the Commission to implement deferred accounting for corresponding costs. However, the Commission explained in its order that NIPSCO was differently situated because it was subject to a settlement that prohibited changes in rates, tariffs, terms and conditions during a specified period of time. Moreover, the Commission is not required to afford identical relief to all utilities in every circumstance. To be sure, the relevant question is not the degree of consistency with prior orders but rather whether there is a reasonable basis for its decision in the particular case. *See Ogden v. Premier Properties, USA, Inc.,* 755 N.E.2d 661, 671 (Ind. Ct.App.2001).

By way of illustration, in *Office of Utility Consumer Counselor v. Bd. Of Directors for Utilities of the Dept. of Pub. Utilities,* this court rejected an argument that the Commission was *required* to adhere to a cost recovery mechanism just because it had been approved previously for other utilities. 678 N.E.2d 1127, 1129 (Ind.Ct.App.1997). We determined that the Commission is authorized to adjust its

policies "with appropriate explanation." *Id.* We went on to observe that "the Commission may choose to charge transition costs to one group yet not to another if that choice is based upon reasonable differences in the class of customer or the type of service." *Id.* at 1129–30.

Here, NIPSCO admitted that one of the justifications for its deferred accounting method is to avoid the immediate need for an otherwise unnecessary rate case. NIPSCO agreed not to commence a rate case during the settlement period, and thus the Commission was not presented with a choice between granting exceptional accounting treatment or precipitating a general rate proceeding. Hence, it can fairly be said that NIPSCO's commitment not to file a rate case meaningfully distinguishes its request for deferred accounting from the circumstances of other utilities. That said, we conclude that the Commission properly rejected NIPSCO's request for its proposed deferred accounting. method.

The judgment of the Commission is affirmed.

KIRSCH, C.J., and BARNES, J., concur.