NORTHERN INDIANA PUBLIC SERVICE COMPANY, Appellant-Respondent,
v.
JUPITER ALUMINUM CORPORATION and INDIANA OFFICE OF UTILITY CONSUMER COUNSELOR, Appellees-Petitioners.
No. 93A02-0505-EX-403
Court of Appeals of Indiana.
December 22, 2006
STANLEY C. FICKLE, DANIEL W. McGILL, P. JASON STEPHENSON, Barnes & Thornburg, Indianapolis, Indiana, ATTORNEYS FOR APPELLANT.
MICHAEL B. CRACRAFT, Hackman Hulett & Cracraft, LLP, Indianapolis, Indiana, Ind. Municipal Electric Assn., Inc., LARRY J. WALLACE, Parr Richey Obremskey & Morton Indianapolis, Indiana, Ind., Statewide Assn. of Rural Electric Cooperatives, Inc., WAYNE C. TURNER, SHANNON D. LANDRETH, McTurnan & Turner Indianapolis, Indiana, Indiana Energy Assn., ATTORNEYS FOR AMICI.
JOHN F. WICKES, JR., TODD A. RICHARDSON, Lewis & Kappes, Indianapolis, Indiana, Attorneys for Jupiter Aluminum, ATTORNEYS FOR APPELLEE.

MEMORANDUM DECISION
MAY, Judge.
Northern Indiana Public Service Company ("NIPSCO") appeals and Jupiter Aluminum Corporation ("Jupiter") cross-appeals from a decision of the Indiana Utility Regulatory Commission ("IURC" or "Commission").
NIPSCO raises two related issues, which we restate as: 1) whether the IURC exceeded its statutory authority by requiring NIPSCO to make a direct cash payment of 2.5 million dollars to Jupiter for the purchase of equipment that will benefit Jupiter and that Jupiter will own; and 2) whether the IURC exceeded its statutory authority by prohibiting NIPSCO from recovering the 2.5 million dollars in rates. In its cross-appeal, Jupiter raises one issue: whether the "complete resolution" language in the IURC order bars Jupiter from pursuing legal remedies against NIPSCO.
The resolution of the first two issues depends in part on whether the Commission concluded NIPSCO provided "reasonably adequate service" to Jupiter. However, the Commission's conclusion on this issue is ambiguous and does not permit us to review the order. Nor can we determine what the Commission intended when it used the phrase "complete resolution." Accordingly, we remand this case to the Commission with instructions to clarify its order, enter appropriate findings and conclusions, and submit the revised order to us within sixty days of the date of this opinion.

FACTS AND PROCEDURAL HISTORY
Jupiter operates an aluminum recycling and manufacturing facility in Hammond, Indiana. Jupiter utilizes a continuous manufacturing process in which aluminum scrap is recycled and extruded into large aluminum coils. If the process is halted abruptly, the aluminum material moving through the equipment stops and cools down. This can damage the equipment. The manufacturing restart procedure takes approximately four hours. "[M]anufacturing operations are conducted 24 hours a day, seven days a week, year-round." (NIPSCO App. at 34.)[1]
NIPSCO is an investor-owned public utility in northwest Indiana. NIPSCO provides electric service to Jupiter from the Roxanna substation through a dedicated 34kV line known as Circuit 3409. NIPSCO charges Jupiter for firm electric service.[2]
In April 2003, Jupiter filed a complaint with the IURC alleging NIPSCO had failed to provide "reasonably adequate" electric service. See Ind. Code § 8-1-2-4 ("Every public utility is required to furnish reasonably adequate service and facilities.") Jupiter's complaint alleged it had suffered thirty-eight outages between 1995 and April 2003, which outages significantly disrupted its manufacturing process.[3] After an evidentiary hearing in July 2003, the IURC issued an interim order in December 2003, requiring NIPSCO to "fully evaluate the power quality aspects of circuit 3409 from which Jupiter receives service." (NIPSCO App. at 46.)
NIPSCO retained GE Industrial Systems Services to monitor and evaluate Circuit 3409. After receiving GE Industrial's report from NIPSCO in October 2004, the IURC entered its final order in April 2005. The Commission summarized the proceedings, the initial and final reports from NIPSCO, NIPSCO's conclusions and recommendations, and Jupiter's response to the report and its recommendations. The final order then provided:
5. Findings and Analysis of the Commission. NIPSCO indicates in its Initial and Final Reports that it failed to find the "smoking gun" regarding the problems experienced at the Jupiter Facility. NIPSCO['s] inability to locate a single issue (or "smoking gun") as the cause of the chronic problems faced by the Jupiter facility over the past several years is not surprising. It was our expectation that further evaluation and investigation of the apparently chronic and long term issues faced by Jupiter Aluminum could assist the Commission in more fully evaluating an appropriate resolution of the issues presented in this matter. Implicit in our determination was the expectation that the parties would attempt to resolve this matter by agreement based on their own review of the Initial and Final Report, coupled with an internal evaluation of the specific issues (if any) that needed to be addressed within the Jupiter facility. Unfortunately while the parties have presented specific proposals on what they believe are appropriate means to resolve this matterit has not been resolved by agreement.
* * * * *
GE Industrial indicated in its Initial Report that based on its analysis of all the data the cause of the outages and voltage sags was from a variety of system faults including weather, vehicle collision, static line failure, pole repair, cable failure, neighbor line interference, and 138kV equipment failure. NIPSCO's investigation into the power quality problems has resulted in an Initial and Final Report that hasin many respectssimply recommended that NIPSCO perform basic maintenance that NIPSCO should have been doing all along in an effort to remedy the outages suffered by Jupiter.
While actions taken by NIPSCO to date, and its commitment to continue to review, maintain, and monitor the Roxanna Substation and line 3409, appear to be important steps to address the issues presented in this Cause, based on our review of the Initial and Final Report it appears that NIPSCO's failure to address these issues earlier could have contributed to a number of outages suffered by Jupiter. While NIPSCO could have done a better job with respect to routine maintenance, like any other industrial customer, Jupiter Aluminum could have requested (and received) a backup line years ago which could have prevented or reduced outages that have impacted production at the facility. Certainly the long term nature of the problems faced by Jupiter could have been addressed much sooner by the parties, or presented to the Commission for resolution, rather than allowing the problems to continue. While we find some merit in the service quality issues presented by Jupiter in its Complaint, as Jupiter seemingly chose not to pursue options available to itto request a backup line and install switching equipment at its facilitywe will not attempt to roll back the clock to remedy the impact of this decision as part of our consideration and resolution of the issues presented in this Cause.
The parties have not been able to resolve this matter and have instead made recommendations to the Commission that demonstrate how far apart the parties are with respect to resolving this matter by agreement. [Jupiter's recommendation includes installation of a backup line and switching mechanism at NIPSCO's expense plus a refund of 42% of all payments it made to NIPSCO from January 1995 to September 2004, with interest.] Accordingly, if the Commission were to grant the entirety [of] Jupiter's request the total cost to NIPSCO would be well in excess of $10,000,000.
Under the proposed resolutions submitted by NIPSCO, the Company indicated its willingness to pay the costs associated with providing a backup line (estimated to be $185,000) to Jupiter Aluminum. [NIPSCO also recommended Jupiter pay for the cost and installation of] a fast S&C static switch (which would switch Jupiter's load from Circuit 3409 to a backup circuit in less than one cycle). NIPSCO estimated the costs of the fast S&C static switch to be $2.5 Million Dollars[.]
While we do not conclude based on the evidence presented in this matter that NIPSCO has failed to provide reasonably adequate service to Jupiter over the entire period specified by Jupiter in this proceeding, we nonetheless recognize that Jupiter has had a number of issues regarding its service quality over an extended period of time and that those issues seemingly continued during GE Industrial's investigation. We also recognize that NIPSCO now appears to be working diligently in an effort to remedy the issues presented by its customer. It is our expectation, and a condition of this Order, that NIPSCO will continue to work to ensure that any remaining issues regarding its service to Jupiter are fully resolved in a manner consistent with our findings in this Order.
Therefore, we find based on the evidence presented in this Cause, and our review of the Initial and Final Report and Jupiter's Response, that an equitable and appropriate resolution of this matter is as follows:
A. NIPSCO shall continue to implement the specific commitments made by the company and recommendations made by GE Industrial in its Initial and Final Reports in order to fully address power quality issues at Jupiter Aluminum. [NIPSCO is also required to file Compliance Reports with the Commission.]
B. NIPSCO shall provide a backup line capable of providing the 4160 voltage power requirement complying with NIPSCO's Power Quality Standard ER 16-600-A, from the Roxanna substation (or another substation if NIPSCO determines this is necessary to fully address the issues presented in this Cause). The backup line shall be provided in a more direct route to Jupiter Aluminum than the line that currently serves the facility. . . . NIPSCO shall be responsible for all costs associated with the installation of the backup line. In addition, we find that as part of the resolution of the issues presented in this Cause that NIPSCO should also be responsible for the costs associated with the purchase and installation of a fast static switch capable of automatically switching power in less than one cycle in the event of a power outage or voltage fluctuation. Therefore, NIPSCO shall, within thirty (30) days of the effective date of this Order, pay Jupiter Aluminum $2.5 Million Dollars (this amount is consistent with the estimate provided by NIPSCO and shall not be recovered in rates) to cover the costs necessary for Jupiter to purchase and install a fast static switch capable of automatically switching power in less than one cycle in the event of a power outage or voltage fluctuation.
C. NIPSCO's compliance with the terms and conditions contained in this Order, including the installation of the backup line and payment to Jupiter Aluminum of costs associated with the purchase and installation of a fast static switch, shall constitute the complete resolution of all issues presented by Jupiter in its Complaint.
(Id. at 21-23.) A footnote to Paragraph B provides: "Jupiter shall own and maintain the equipment it purchases pursuant to this Order and shall submit a compliance filing to the Commission when it has completed the installation of the equipment." (Id. at 23 n.8.)
Both NIPSCO and Jupiter petitioned the IURC for reconsideration. While waiting for the IURC to rule, NIPSCO initiated this appeal but asked the appeal be stayed temporarily to allow the IURC to rule. We granted the stay, and the IURC denied both petitions for reconsideration without comment. NIPSCO then petitioned us to stay the Final Order pending appeal, which petition we denied on July 13, 2005.[4] In December 2005, Jupiter sought to have the case remanded to the IURC for further review in light of changed circumstances.[5] We denied the request for remand.[6]

DISCUSSION AND DECISION[7]
"[T]he IURC derives its power solely from the legislature; if the power to act has not been conferred by statute, it does not exist." S. E. Ind. Natural Gas Co. v. Ingram, 617 N.E.2d 943, 947 (Ind. Ct. App. 1993). Any doubt about the existence of authority must be resolved against a finding of authority. Id.
The standard by which we review the Commission's order is well settled:
[T]he Commission's order is subject to appellate review to determine whether it is supported by specific findings of fact and by sufficient evidence, as well as to determine whether the order is contrary to law. A Commission finding can be set aside only when a review of the entire record clearly indicates that its decision lacks a reasonably sound basis of evidentiary support. In reviewing a Commission order, we do not reweigh the evidence or substitute our judgment for that of the Commission. Put another way, in those instances where the legislature has created a fact-finding body of experts in another branch of the government, their decision or findings should not be lightly overridden and set aside because we, as judges, might reach a contrary opinion on the same evidence.
We also note that a decision is contrary to law when the agency fails to stay within its jurisdiction and to abide by the statutory and legal principles that guide it. Issues that are reviewable under this standard include questions of legality of the administrative procedure and violations of fixed legal principles as distinguished from questions of fact or expert judgment or discretion. An appellate court may properly defer to the Commission's expertise both in finding the facts and in applying the law to the facts.
N. Ind. Pub. Serv. Co. v. Ind. Office of Util. Consumer Counselor, 826 N.E.2d 112, 117-18 (Ind. Ct. App. 2005) (internal citations omitted).
To facilitate judicial review, Commission orders ought to include both basic findings (specific findings of fact) and ultimate findings (conclusions). Charles W. Cole & Son, Inc. v. Ind. & Mich. Elec. Co., 426 N.E.2d 1349, 1352-53 (Ind. Ct. App. 1981).
Basic findings are less detailed than a summary of the evidence, and they are not merely a recitation of testimony given or other evidence introduced. Basic findings are statements of those facts which the [Commission] determines, after considering the evidence introduced, to be true and relevant to factual determinations which must be made in order to properly decide the case.
Id. at 1353. If, as here, the Commission's findings are "inadequate to permit us intelligently to review" the Commission's order, we may remand to the Commission for entry of an appropriate order. Id. at 1354.

1. Complaint Procedure
The Spencer-Shively Utility Commission Act of 1913 is the basis of utility regulation in Indiana. The regulatory scheme
operates primarily to protect consumers and assure them of continuing service at a reasonable price. In the ideal free market economy, this assurance is usually provided by competition, which keeps prices from becoming unreasonably high. However, economies of scale often dictate that utilities can be provided to consumers more efficiently by granting a monopoly to one company. The role of the commission in such a case becomes one of compensating for the missing element of competition, assuring a fair price to the consumer and a fair return to the utility, which in turn assures a continuing supply of the commodity or service provided by the utility.
N. Ind. Pub. Serv. Co. v. Citizens Action Coal. of Ind., 548 N.E.2d 153, 159-60 (Ind. 1989). Our Indiana Supreme Court has explained:
The bedrock principle behind utility regulation is the so-called "regulatory compact," which
arises out of a "bargain" struck between the utilities and the state. As a quid pro quo for being granted a monopoly in a geographical area for the provision of a particular good or service, the utility is subject to regulation by the state to ensure that it is prudently investing its revenues in order to provide the best and most efficient service possible to the consumer. At the same time, the utility is not permitted to charge rates at the level which its status as a monopolist could command in a free market. Rather, the utility is allowed to earn a "fair rate of return" on its "rate base." Thus, it becomes the Commission's primary task at periodic rate proceedings to establish a level of rates and charges sufficient to permit the utility to meet its operating expenses plus a return on investment which will compensate its investors.
U.S. Gypsum, Inc. v. Ind. Gas Co., 735 N.E.2d 790, 797 (Ind. 2000) (quoting Ind. Gas Co. v. Office of Util. Consumer Counselor, 575 N.E.2d 1044, 1046 (Ind. Ct. App. 1991)). The role of the Commission is thus two-fold: to ensure the adequacy of the service provided to customers by the utility and to ensure the fiscal health of the utility so that it will continue to be able to provide the service. The Commission must determine a rate of return and rates that are fair both to the consumer and to the utility's investors. Id.
Consumers and other entities may lodge complaints against a utility with the Commission concerning rates or service when either fails to meet the standards announced in Ind. Code § 8-1-2-4:
Every public utility is required to furnish reasonably adequate service and facilities. The charge made by any public utility for any service rendered or to be rendered either directly or in connection therewith shall be reasonable and just, and every unjust or unreasonable charge for such service is prohibited and declared unlawful.
Ind. Code § 8-1-2-54 describes three broad categories of complaints: unreasonable rates, unreasonable acts or practices, and inadequate service.
Upon a complaint made against any public utility . . . that any of the rates, tolls, charges or schedules or any joint rate or rates in which such petitioner is directly interested are in any respect unreasonable or unjustly discriminatory, or that any regulation, measurement, practice or act whatsoever affecting or relating to the service of any public utility, or any service in connection therewith, is in any respect unreasonable, unsafe, insufficient or unjustly discriminatory, or that any service is inadequate or can not be obtained, the commission shall proceed, with or without notice, to make such investigation as it may deem necessary or convenient. But no order affecting said rates, tolls, charges, schedules, regulations, measurements, practice or act, complained of, shall be entered by the commission without a formal public hearing.
Ind. Code § 8-1-2-69 describes possible Commission actions in non-rate disputes, such as the complaint brought by Jupiter.[8] In addition to a prospective remedy (i.e., ordering an unsafe practice be replaced), this section provides for "other orders" that are just and reasonable.
Whenever, upon the investigation made under the provisions of this chapter, the commission shall find any regulations, measurements, practices, acts, or service to be unjust, unreasonable, unwholesome, unsanitary, unsafe, insufficient, preferential, unjustly discriminatory, or otherwise in violation of any of the provisions of this chapter, or shall find that any service is inadequate or that any service which can be reasonably demanded can not be obtained, the commission shall determine and declare and by order fix just and reasonable measurements, regulations, acts, practices, or service to be furnished, imposed, observed, and followed in the future in lieu of those found to be unjust, unreasonable, unwholesome, unsanitary, unsafe, insufficient, preferential, unjustly discriminatory, inadequate, or otherwise in violation of this chapter, as the case may be, and shall make such other order respecting such measurement, regulation, act, practice, or service as shall be just and reasonable.
Ind. Code § 8-1-2-69. The plain language of the latter clause suggests an "other order" could be retroactive or remedial. See Airco Indus. Gases v. Ind. Mich. Power Co., 614 N.E.2d 951 (Ind. Ct. App. 1993) ("other order" language of Ind. Code § 8-1-2-69 allows Commission to order unreasonably retained funds paid under improperly-filed tariff returned without violating retroactive ratemaking provision).[9]
Before an order can be issued under Ind. Code § 8-1-2-69, the Commission must conduct an investigation. See Ind. Code § 8-1-2-69 ("upon the investigation made"). In addition, the Commission must find an act, practice or service of the utility is inappropriate or otherwise in violation of one of the statutory provisions, the service is inadequate, or the service cannot be obtained on reasonable demand. The plain language of the statute indicates failure to make such a finding strips the Commission of the authority to order remedies under Ind. Code § 8-1-2-69.

2. Commission Findings
The Commission's order for NIPSCO to pay Jupiter 2.5 million dollars is an "other order" that could be entered, if at all, only under Ind. Code § 8-1-2-69. The parties argue the validity of this order. However, the first question we must address is whether the Commission made a finding that would permit it to enter an "other order" under Ind. Code § 8-1-2-69.
NIPSCO and Jupiter disagree about whether the Commission found NIPSCO provided reasonably adequate service. Each party begins by focusing on the following sentence from the Commission's Final Order:
While we do not conclude based on the evidence presented in this matter that NIPSCO has failed to provide reasonably adequate service to Jupiter over the entire period specified by Jupiter in this proceeding, we nonetheless recognize that Jupiter has had a number of issues regarding its service quality over an extended period of time and that those issues seemingly continued during GE Industrial's investigation.
(NIPSCO App. at 22.) By stressing different portions of the first clause, NIPSCO and Jupiter arrive at contradictory interpretations.
Jupiter asserts:
With the vast majority of the outages concentrated in the second half of the ten-year period at issue, the finding there was not a failure to provide reasonably adequate service "over the entire period" obviously indicates service deficiencies during a substantial portion of that period, as the Commission concluded in the same sentence that "Jupiter has had a number of issues regarding its service quality over an extended period of time."
(Jupiter Br. at 25) (emphases by Jupiter). Jupiter concludes: "In the context of those findings of persistent service problems, not attributable to Jupiter's equipment, the Commission's comment that NIPSCO did not fail to provide reasonably adequate service 'over the entire period specified by Jupiter' can hardly be construed as a vindication of NIPSCO's service quality." (Id.)
NIPSCO responds:
The Commission did not find NIPSCO failed to provide reasonably adequate service over any "portion" of the period. The point is punctuated by the Commission's denial of Jupiter's petition "request[ing] that the Commission reconsider the Final Order and find that NIPSCO has indeed failed to provide reasonably adequate service to Jupiter."
When the Commission intends to find failure to provide reasonably adequate service, it knows how to say that. It obviously made a conscious determination not to make such a finding in this case.
(NIPSCO Reply Br. at 7) (emphases by NIPSCO). NIPSCO also argues the "Commission may find problems with a public utility's service that do not pass the legal threshold of failure to provide reasonably adequate service." (Id. at 6-7) (emphases by NIPSCO).[10]
Much of the language in the findings and analysis section of the Commission's Order is tentative and indeterminate,[11] making it difficult to ascertain which party's factual assertions the Commission credited and, in turn, what the Commission found. Because of the ambiguity in the Final Order regarding whether NIPSCO provided reasonably adequate service, each party can support its interpretation of the Order by referring to various statements in the Commission's Final and Interim Orders and in the reports from GE Industrial.
We may neither reweigh the evidence nor substitute our judgment for that of the Commission. NIPSCO, 826 N.E.2d at 118. Without specific findings that indicate the results of the Commission's considered examination of the evidence, we are unable to determine what the Commission ultimately concluded regarding the adequacy of NIPSCO's service to Jupiter or whether the findings support that conclusion.

4. Order on Remand
Because the findings are inadequate to permit us to review the order intelligently, we remand this case to the Commission. The Commission is directed to determine within 60 days whether NIPSCO failed to provide reasonably adequate service to Jupiter over the period or any portion thereof referred to in the complaint; to issue findings of fact and conclusions of law in an appropriate order;[12] and to file the order with the Clerk of this Court. Pursuant to Ind. Appellate Rule 37(B), this appeal is held in abeyance until such time as the Commission proceedings on this order have concluded. This Court retains jurisdiction of this appeal in order to determine the merits of the legal arguments already briefed by the parties and the amici curiae. The Commission is directed to acknowledge this order within 10 days.
Remanded with instructions.
SULLIVAN, J., and BAKER, J., concur.
NOTES
[1] We adopt the following abbreviations in citing to briefs, addenda and appendices submitted:
NIPSCO Br. Brief of Appellant NIPSCO
NIPSCO App. Appendix of Appellant NIPSCO
NIPSCO Reply Br. Reply Brief of Appellant and Brief of Cross-Appellee NIPSCO
Jupiter Br. Brief of Appellee and Cross-Appellant Jupiter
Jupiter Reply Br. Reply Brief of Cross-Appellant Jupiter

[2] NIPSCO explains the difference between firm and interruptible service:

Customers with "firm" service can demand power or transmission at any time the public utility can provide it. In contrast, service may be shut off under specified circumstances to customers that have agreed to "interruptible" service. Interruptible service is offered at a discount because the public utility's ability to cut off service during peak demand periods lessens its need to plan for and finance additional electric generation capacity.
(NIPSCO Br. at 8 n.6.)
[3] Three types of outages are discussed. A "sustained interruption" is a complete disconnection from the source of power for more than five minutes. (NIPSCO App. at 55.) A "momentary disruption" is a complete disconnection from the source of power for less than five minutes. (Id.) A "voltage sag" is "a dip from 10% to 90% of nominal voltage from one half-cycle to one minute with no disconnection from the source of power." (Id.) A cycle is 1/60 of a second.

Many of Jupiter's shutdowns apparently occurred because of voltage sags, which are not "outages" under industry definitions. NIPSCO accordingly challenges the number of "outages" claimed by Jupiter, asserting there were only 22 outages (8 sustained, 14 momentary) over an eight-year period. (NIPSCO Reply Br. at 16.) The Commission did not make a specific finding as to the number of complete disconnections or voltage sags Jupiter experienced.
Jupiter claimed additional outages occurred during the IURC proceedings.
[4] The Indiana Energy Association (IEA), the Indiana Municipal Electric Association (IMEA) and the Indiana Statewide Association of Rural Electric Cooperatives (ISAREC) filed a motion to appear as amici curiae in support of NIPSCO on October 24, 2005. We granted this motion on August 10, 2006.
[5] Jupiter's motion for remand asserted the technical solution crafted by the IURC may not be sufficient because a voltage drop will result when power is switched to a backup line that could cause an outage at Jupiter. Jupiter also notes it has added equipment that has increased its electricity needs beyond the capacity of the fast static switch contemplated in the Final Order. This, it asserts, requires a larger and more expensive switch.
[6] Jupiter initiated a second proceeding before the IURC under Cause No. 43012. Jupiter also initiated a suit against NIPSCO in the Lake County Circuit Court on May 19, 2006. "As that complaint is not before the Court, Jupiter does not seek any ruling as to its contents." (Jupiter Reply Br. at 8 n.3.)
[7] We held oral argument on October 17, 2006, in Indianapolis. We thank counsel for their presentations.
[8] Ind. Code § 8-1-2-68 describes the actions the Commission can take with respect to rate disputes. Remedies under this section are prospective and include rate changes.
[9] In Airco, various industrial consumers objected to tariffs proposed by Indiana Michigan. The IURC agreed in part with the consumers and ordered Indiana Michigan to modify the proposed tariff accordingly. Indiana Michigan modified the tariff but not as ordered by the IURC. However, the tariff was approved and went into effect. When the consumers petitioned the IURC, the IURC agreed the tariff was improper and ordered Indiana Michigan to change it. However, believing it could not order a refund in rates, the IURC declined to do so. On appeal, we held Ind. Code § 8-1-2-69 permits the IURC to make such other order because it was unreasonable to allow Indiana Michigan to retain funds "to which it would not have been entitled but for [Indiana Michigan] filing an inappropriate tariff." 614 N.E.2d at 954.
[10] Jupiter also suggests the Commission intended to find NIPSCO's acts, practices or service were inappropriate for reasons other than the reliability of the electric service, noting the Commission's Interim Order was critical of NIPSCO. NIPSCO responds the "ultimate finding in the Interim Order was that 'further investigation . . . is warranted prior to any ruling being made on the issues presented.' (App. 46) (emphasis added)." (NIPSCO Reply Br. at 21.)
[11] E.g., NIPSCO's failure to investigate and maintain Circuit 3409 earlier "could have contributed to a number of" Jupiter's outages. (NIPSCO App. at 21.) A backup line "could have prevented or reduced outages" at Jupiter. (Id.) Jupiter's service quality issues have "some merit" but are ultimately insufficient to require a refund. (Id.)
[12] The Commission should also clarify whether the "complete resolution" language in its order refers to administrative remedies, legal remedies, or both.